In the

# United States Court of Appeals
## For the Seventh Circuit

———————

No. 05-1916

DENNIS F. SPERANDEO,

*Plaintiff-Appellant*,

*v.*

LORILLARD TOBACCO COMPANY,
INCORPORATED, and CONTINENTAL CASUALTY
COMPANY, also known as CNA,

*Defendants-Appellees*.

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 C 3214—**Harry D. Leinenweber**, *Judge.*

———————

ARGUED MAY 2, 2006—DECIDED AUGUST 18, 2006

———————

Before CUDAHY, RIPPLE and WOOD, *Circuit Judges*.

RIPPLE, *Circuit Judge.* Dennis Sperandeo brought this action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq. He sought an award of disability payments under ERISA, 29 U.S.C. § 1132(a)(1)(B), seeking disability income benefits from Lorillard Tobacco Company, Inc.'s ("Lorillard") Group Disability Income Insurance Policy, underwritten by Continental Casualty Company, also known as CNA ("CNA"). The district court granted summary judgment

in favor of the plan administrator CNA. For the reasons set forth in the following opinion, we affirm in part and reverse in part the judgment of the district court and remand the case to the district court for further proceedings consistent with this opinion.

# I

# BACKGROUND

## A. Facts

Mr. Sperandeo began working at Lorillard as a sales representative in September 1970. On May 7, 2001, he was involved in an automobile accident while he was delivering boxes of tobacco to one of Lorillard's customers. As a result of this collision, he suffered injuries to his head and shoulder. The hospital records from the day of the accident indicate that Mr. Sperandeo suffered a concussion and a "shoulder sprain." R.14, Ex.B at 204-05. The extent of those injuries, as well as their lasting effects on Mr. Sperandeo, are disputed.

Since the accident, Mr. Sperandeo has been treated by a number of physicians and has undergone physical therapy. On August 29, 2001, he underwent left rotator cuff and acromioplasty surgery performed by Dr. David Zoellick. On October 10, 2002, he underwent a second rotator cuff reconstructive surgery performed by Dr. Jeffery Visotsky. Mr. Sperandeo also was treated by a neurologist, Dr. Glen Glista, and by an otologist-neurologist, Dr. Dennis Moore. Additionally, he was examined by several other neurological specialists. With the exception of two days in January 2002, Mr. Sperandeo has not returned to work at Lorillard.

At all times relevant to this litigation, Mr. Sperandeo was covered by Lorillard's Group Disability Income Insurance Policy, which is underwritten and administered by CNA. The plan qualifies as a defined welfare benefit plan under ERISA, 29 U.S.C. § 1002(1). The Certificate of Insurance issued by CNA contains the following language defining disability:

> **How do We define Disability?**
>
> Disability or Disabled means that You [the Lorillard employee to whom the Certificate was issued] satisfy the Occupation Qualifier or the Earnings Qualifier as defined below.
>
> **Occupation Qualifier**
>
> Disability means that during the Elimination Period and the following 24 months, Injury or Sickness causes physical or mental impairment to such a degree of severity that You are:
>
>> 1) continuously unable to perform the Material and Substantial Duties of Your Regular Occupation; and
>>
>> 2) not Gainfully Employed.

R.14, Ex.A at 13, 25 (emphasis omitted). "Material and Substantial Duties" of employment are defined to mean "the necessary functions of Your Regular Occupation which cannot be reasonably omitted or altered." *Id.* at 24 (emphasis omitted).

On July 10, 2002, Mr. Sperandeo filed a claim with Lorillard for long term disability benefits under the plan; Lorillard submitted Mr. Sperandeo's claim to CNA for review. The claim was accompanied by a number of medical records submitted by Mr. Sperandeo and a Physical Demands Analysis ("PDA") completed by Lorillard. The PDA detailed the primary duties of the job of sales representative,

which included driving to and from clients' businesses, rotating and checking clients' inventories of cigarettes, assembling display units and data entry. The PDA outlined the physical demands of accomplishing these duties. They included bending, twisting, extending/reaching and lifting products weighing from two pounds for one carton of cigarettes to thirty-eight pounds for a whole case.

CNA employees reviewed Mr. Sperandeo's medical records and interviewed him regarding his symptoms and limitations. On October 4, 2002, CNA denied Mr. Sperandeo's claim for benefits. CNA informed Mr. Sperandeo that the medical evidence did not support "functional impairments from either a physical or mental/nervous standpoint that would continuously preclude [him] from performing the substantial and material duties" of a sales representative. *Id.*, Ex.B at 188.

Mr. Sperandeo appealed this decision and supplied CNA with additional medical records. On January 28, 2003, the appeals committee notified him that it had upheld the denial of benefits. *See id.* at 5-6. Mr. Sperandeo then brought this action against CNA and Lorillard[1] under ERISA, 29 U.S.C. § 1132(a)(1)(B), seeking an award of disability income benefits under the plan.

---

[1] The district court granted summary judgment to defendant Lorillard, stating that, under ERISA, only the plan is a proper defendant. *See* R.26 at 5-6 (citing 29 U.S.C. § 1132(a)(1)(B)). The district court therefore concluded that Lorillard, Mr. Sperandeo's employer, is not the proper party. *Id.* Mr. Sperandeo has not appealed the grant of summary judgment to Lorillard, and accordingly, the only remaining defendant for the purposes of this appeal is CNA.

## B. District Court Proceedings

### 1.

In ruling on CNA's motion for summary judgment, the district court first decided that the appropriate standard for its review of CNA's determination was de novo. In reaching that conclusion, it articulated the rule set forth by the Supreme Court in *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Under that rule, a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone*, 489 U.S. at 115. The district court noted that the language granting discretionary authority to CNA only was found in the Summary Plan Description ("SPD") and the Certificate of Insurance ("Certificate"), not in the policy itself. CNA had contended that the discretionary language in the Certificate should be considered part of the policy or, in the alternative, that it was incorporated into the policy. The district court rejected both submissions. The court noted that the Certificate explicitly states that the Certificate is not part of the policy; similarly, the SPD states that it is not part of the plan. The court further noted that the policy, while discussing the contents of the Certificate, did not incorporate the Certificate into the policy. R.26 at 8. The district court then reasoned that, because the discretionary language was not part of the policy, it was not part of the plan. Accordingly, the court followed the rule announced in *Firestone* and concluded that de novo review was appropriate.

**2.**

The district court then turned to the merits of the summary judgment motion. It determined that CNA was correct in denying Mr. Sperandeo disability benefits based on his shoulder injury. In the court's view, the PDA established that "a sales representative's primary material and substantial duties are driving, walking, sitting, and standing," and there was no medical evidence that Mr. Sperandeo's shoulder injury "impair[ed] his ability to perform these tasks." R.26 at 15. The court also noted that the PDA indicated that a sales representative must lift cases of cigarettes from floor to ceiling five times per day. *Id*. at 16. The court recognized that Mr. Sperandeo had a permanent lifting restriction of thirty-five pounds, and that some of the cases of cigarettes would weigh as much as thirty-eight pounds. *Id.* However, the court noted that the typical weight of a case was twenty-one pounds and that without any evidence of how often a case is over thirty-five pounds, and thus over Mr. Sperandeo's limit, the activity of lifting over thirty-five pounds "cannot be considered to be a substantial duty." *Id.*

The court also concluded that CNA's decision to deny benefits based on Mr. Sperandeo's neurological condition was correct. The court observed that Mr. Sperandeo did provide evidence that he suffered from "post concussive syndrome," but, continued the court, the evidence did not support the conclusion that it made him "<u>continuously unable</u> to perform the <u>material</u> and <u>substantial</u> duties of his job." *Id.* (emphasis in original). The court supported this conclusion by noting that Mr. Sperandeo had completed a driving test that showed he could drive without limitations and that several neurologists and a psychologist believed that Mr. Sperandeo could return to work. The court

further noted that Dr. Christopher Randolph, an examining physician, had opined that Mr. Sperandeo was "exaggerating his symptoms and exerting little effort on his diagnostic tests." *Id*. Although a treating physician, Dr. Gerald Lewis, did opine that Mr. Sperandeo should not return to work, the court stated that this opinion was "contrary to the driving test results and not supported by the other medical opinions and evidence presented." *Id*. Therefore, the court concluded that Mr. Sperandeo was not entitled to benefits based on his neurological condition.

## II

## DISCUSSION

### A. Standard of Review

We review a district court's grant of summary judgment de novo, drawing all reasonable inferences in the light most favorable to the non-moving party. *Vallone v. CNA Fin. Corp.*, 375 F.3d 623, 631 (7th Cir. 2004).

In this appeal, we also must determine whether the district court employed the correct standard of review. CNA submits that the district court erred in applying de novo review rather than the "arbitrary and capricious" standard in reviewing the denial of benefits. As we noted earlier, the Supreme Court has stated that a denial of benefits is to be reviewed de novo "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone*, 489 U.S. at 115. CNA has the burden to establish that the language of the plan gives it discretionary authority to award benefits. *See Gibbs ex rel. Estate of Gibbs v. CIGNA Corp.*, 440 F.3d 571, 575 (2d Cir. 2006). We have emphasized that the default standard of review is de novo and that, in

order to alter this default standard, the "stipulation [for deferential review] must be clear." *Herzberger v. Standard Ins. Co.*, 205 F.3d 327, 332 (7th Cir. 2000).

As a threshold matter, we must identify the documents that constitute the plan. In other cases, identification of the plan has presented difficult analytical questions. Indeed, we have remarked that confusion as to what constitutes "the plan" for purposes of ERISA is "all too common." *Health Cost Controls of Ill., Inc. v. Washington*, 187 F.3d 703, 712 (7th Cir. 1999). In this respect, ERISA is not particularly helpful in delineating those documents that constitute the plan.[2] We, along with other circuits, however, have held that the underlying insurance policy is a plan document for purposes of determining the standard of review. *See Ruiz v. Cont'l Cas. Co.*, 400 F.3d 986, 991 (7th Cir. 2005) (citing cases); *see also Houston v. Provident Life & Accident Ins. Co.*, 390 F.3d 990, 995 (7th Cir. 2004) (holding that language granting discretion to the plan administrator found in the insurance policy was sufficient to trigger arbitrary and capricious review).

---

[2]  29 U.S.C. § 1002(1) defines "employee welfare benefit plan" and "welfare plan" as

> any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise (A). . . benefits in the event of sickness, accident, disability, death or unemployment . . . .

After reviewing the record on appeal,[3] we must conclude that the language of this policy contains no indication that CNA is entitled to exercise unfettered discretion in determining whether a Lorillard employee is eligible for disability benefits. CNA points, however, to language in the Certificate to support its view that it enjoys such discretion:

> The plan administrator and other plan fiduciaries have discretionary authority to determine Your eligibility for and entitlement to benefits under the Policy. The plan administrator has delegated sole discretionary authority to Continental Casualty Company to determine Your eligibility for benefits and to interpret the terms and provisions of the Policy.

R.14, Ex.A at 26 (emphasis omitted). Notably, however, the Certificate further states that "[t]his certificate, however, is not the Policy. It is merely evidence of insurance provided under the Policy." *Id.* at 4. Therefore, neither the Certificate nor the policy contains language incorporating the Certificate into the policy. In fact, the opposite is true; the Certificate is explicitly *not* part of the policy.

The Summary Plan Description ("SPD") also indicates that CNA has discretionary authority:

> The Administrator and other Plan fiduciaries have discretionary authority to interpret the terms of the Plan and to determine Your eligibility for and entitlement to benefits in accordance with the Plan. With respect to

---

[3] On this key point, the record in this case can be described charitably as disheveled. Despite the importance of the documents to the outcome of this issue, the documents in the record appear to be out of proper order.

> making benefit decisions, the Plan Administrator has delegated sole discretionary authority to Continental Casualty Company to determine Your eligibility for and entitlement to benefits under Plan and to interpret the terms and provisions of any insurance policy issued in connection with the Plan.

*Id.* at 27. However, the SPD also states that it "does not constitute a part of the Plan, nor of any insurance policy issued in connection with it." *Id.*

On the record before us, then, the basic plan document, the policy, contains no indication that CNA, as the plan administrator, has authority to exercise the sort of discretion that would justify the deferential judicial review discussed in *Firestone* and *Herzberger*. Two other documents, the Certificate and the SPD, do contain language conferring discretion on CNA, but these two documents are not incorporated by reference into the policy or plan. Indeed, the terms of both documents make clear that they are not so incorporated.

This situation is not new to this court. Indeed, we recently had occasion to deal with such a situation in *Schwartz v. Prudential Insurance Co. of America*, 450 F.3d 697 (7th Cir. 2006). There we determined that a plan administrator cannot rely on extra-plan documents to expand its discretion when the plan itself bestows no such discretion.[4] *Id.* at

---

[4] CNA relies on two cases in which discretionary language appearing in a certificate of insurance, but not in a policy, was deemed sufficient to trigger the arbitrary and capricious standard of review. *See Shyman v. Unum Life Ins. Co.*, 427 F.3d 452, 455 (7th Cir. 2005); *Ruiz v. Cont'l Cas. Co.*, 400 F.3d 986, 991 (7th Cir. 2005). However, not only were both of these cases decided before
(continued...)

699-700. In *Schwartz*, we noted our agreement with the reasoning of our colleagues on the Court of Appeals for the Eleventh Circuit in *Shaw v. Connecticut General Life Insurance Co.*, 353 F.3d 1276 (11th Cir. 2003), and on the Court of Appeals for the Ninth Circuit in *Grosz-Salomon v. Paul Revere Life Insurance Co.*, 237 F.3d 1154 (9th Cir. 2001). *Schwartz*, 450 F.3d at 699. *But see Murphy v. Int'l Bus. Machs. Corp.*, 23 F.3d 719, 721 (2d Cir. 1994) (assuming without analysis that a grant of discretion in an SPD was sufficient, although the court did not describe the remainder of the documents).

*Schwartz* controls our decision today. Such a result is also consonant with our oft-repeated concern that any language conferring discretion on plan fiduciaries be clear and unequivocal. *See Diaz v. Prudential Ins. Co. of America*, 424 F.3d 635, 637 (7th Cir. 2005). The lack of discretionary language in the policy itself, coupled with explicit language of the Certificate and the SPD that they are not part of the policy, presents, at the very least, the sort of opaque situa-

---

[4] (...continued)
*Schwartz v. Prudential Insurance Co. of America*, 450 F.3d 697 (7th Cir. 2006), but they also both contain factors not present in the case before us. In *Shyman*, the "package of documents" from the insurer stated that the certificate of insurance was part of the policy unless it contradicted a clause of the policy, and neither party contended that there was such a contradiction. 427 F.3d at 455. Therefore, the certificate was incorporated into the policy. In this case, by contrast, the Certificate explicitly is not incorporated into the policy. In *Ruiz*, we found that both an insurance policy and a certificate of insurance were "plan documents" for purposes of determining the appropriate standard of review; however, there was no indication that the certificate in *Ruiz* contained language explicitly stating that the certificate was not part of the policy. *See* 400 F.3d at 991.

tion that bars under our case law the application of the deferential "arbitrary and capricious" standard of review.

As we emphasized in *Schwartz, Diaz* and *Herzberger*, a plan easily can provide for the deferential standard by setting forth in the plan a clear statement that the administrator has the plenary discretionary authority that warrants the application of such a standard of review. We have gone so far as to draft model language to include in the plan. *See Herzberger*, 205 F.3d at 331.[5] Although we have cautioned that our proposed language does not constitute "magic words," and that other articulations of discretionary power would be sufficient to allow for the arbitrary and capricious standard of review, we certainly have given plan administrators the tools to set up a plan that "will not be characterized as entitling the applicant for benefits to plenary judicial review of a decision turning him down." *Id.* This plan does not indicate in a clear way to plan participants that CNA would review benefits determinations using discretion. CNA failed to put such language in the policy, and instead only put such language in documents that were explicitly not part of the policy or the plan. Therefore, the district court was correct in determining that de novo review was the proper standard of review for Mr. Sperandeo's denial of benefits.

We therefore must determine de novo whether CNA's decision to deny benefits to Mr. Sperandeo was correct. *See Postma v. Paul Revere Life Ins. Co.*, 223 F.3d 533, 540 (7th Cir.

---

[5] The model language proposed by *Herzberger* to be included in ERISA plans is: "Benefits under this plan will be paid only if the plan administrator decides in his discretion that the applicant is entitled to them." *Herzberger v. Standard Ins. Co.*, 205 F.3d 327, 331 (7th Cir. 2000).

2000). In our review of CNA's denial, we shall apply the definition of disability found in the Certificate: Mr. Sperandeo must be "continuously unable to perform the Material and Substantial Duties of [his] Regular Occupation." R.14, Ex.A at 13 (emphasis omitted). "Material and Substantial" is defined as "the necessary functions of [his] Regular Occupation which cannot be reasonably omitted or altered." *Id.* at 24 (emphasis omitted).

**B. Disability Based on Shoulder Injury**

Mr. Sperandeo argues that the district court erred in granting summary judgment to CNA, thus affirming CNA's denial of the benefits he sought due to his shoulder injury. He contends that the denial of benefits was incorrect because he met the definition of disability. Specifically, he claims that the permanent lifting restrictions imposed on him because of his injury rendered him unable to lift cases of cigarettes from the floor to the ceiling as required by the duties of his job.

Mr. Sperandeo underwent rotator cuff repair surgery on his left shoulder on August 19, 2001. Dr. Zoellick, who performed that surgery, stated on July 1, 2002, that Mr. Sperandeo could return to work with the following "permanent restrictions": maximum lifting of thirty-five pounds, maximum overhead lifting of five pounds and overhead work "as tolerated." R.14, Ex.B at 47. On October 10, 2002, Mr. Sperandeo underwent a second reconstructive shoulder surgery performed by Dr. Visotsky. Medical records from both Dr. Zoellick and Dr. Visotsky were reviewed by CNA. Dr. Visotsky placed no permanent restrictions on Mr. Sperandeo.

The PDA completed by Lorillard states that a sales representative must be able to carry a sales bag, weighing between twelve and twenty pounds, for about twenty yards, five times a day, and be able to lift it from the floor and to set it back down. The PDA also states that a sales representative must carry cases of cigarettes, weighing twenty-one to thirty-eight pounds, and lift those cases from "[f]loor to ceiling" five times per day. *Id.* at 482. Additionally, a sales representative must lift counter displays, weighing seven to eleven pounds, from the floor to the counter once per day; he also must roll a floor display weighing seventy-five pounds across the floor once per day. *Id.*

The PDA also contains a grid that is labeled with four categories ("not present," "<33%," "33-66%," ">[sic]100%") at the top, and has various activities listed vertically down the grid, with one of the four percentile boxes selected for each activity. *Id.* A number of activities were marked to be "33-66%," including: kneeling, crouching, grasping, reaching below shoulders, reaching above shoulders, reaching across, twisting of head, operating a motor vehicle and bending at the waist. *Id.*

Mr. Sperandeo notes that the PDA itself states that he will have to lift cases of cigarettes anywhere from the floor to the ceiling five times per day, which necessarily will include lifting the cases above his head if they need to be placed near the ceiling. These cases of cigarettes, weighing up to thirty-eight pounds, greatly exceed the overhead lifting restriction imposed by Dr. Zoellick of five pounds and, on some occasions, will exceed his overall lifting capacity of thirty-five pounds. Mr. Sperandeo contends that lifting such cases is a "material and substantial" duty of his job, Appellant's Br. at 19, and thus he has met CNA's definition of disability because he is unable to complete the task due to

his restrictions.

Based on the lifting restrictions placed on Mr. Sperandeo by Dr. Zoellick, we do not believe that this record supports summary judgment for CNA. In our view, Mr. Sperandeo has raised a material issue of fact as to whether the overhead lifting of cigarette cases is a "material and substantial" duty of his job. The district court did not discuss how the overhead lifting restriction would apply to Mr. Sperandeo's tasks as a sales representative, even though the PDA states that Mr. Sperandeo regularly would have to lift cases of cigarettes as high as the ceiling. On this record, Mr. Sperandeo has come forward with evidence that he has met the policy definition of disabled. According to at least one physician, he has a permanent overhead lifting restriction of five pounds and, therefore, he "continuously" will be unable to lift a cigarette case weighing up to thirty-eight pounds over his head. The PDA completed by Lorillard itself indicates that such lifting well may be a "material and substantial" duty; it states that Mr. Sperandeo must lift cases of cigarettes five times a day and indicates that "lifting above shoulders" would comprise a significant part of Mr. Sperandeo's activities. Therefore, we believe a material issue of fact remains, rendering summary judgment inappropriate.

CNA argues that Mr. Sperandeo could alter the required overhead lifting by taking the cigarette cartons out of the case and lifting them overhead one by one. Such lifting would fall within Mr. Sperandeo's overhead lifting restriction because each cigarette carton weighs only two pounds. While CNA believes that such alteration is possible, there is no indication in the record that Lorillard has ever stated that such alteration would be available. We recognize that in the box on the PDA that asks "How can this job be modified

and for how long?", Lorillard simply wrote "[o]n a Case by Case Basis." *Id.* at 481. However, there is no evidence that Lorillard, or Lorillard's customers, would allow Mr. Sperandeo to take cigarette cartons out of the case and lift them one by one. Therefore, we find that CNA's proposed "modification" is not sufficient to resolve the factual issue regarding the scope of Mr. Sperandeo's overhead lifting tasks.

Therefore, we must reverse the district court's grant of summary judgment as to Mr. Sperandeo's shoulder injury. A material issue of fact remains regarding whether or not overhead lifting of cigarette cases constitutes a "material and substantial" duty of Mr. Sperandeo's employment with Lorillard.

## C. Disability Based on Neurological Condition

Mr. Sperandeo also claims that the district court erred in determining that he is not disabled due to a neurological condition. Mr. Sperandeo points to a number of medical records that he submitted to CNA; he claims that these documents support his claim of neurological disability.

Dr. Steven Wolf, a neurologist, examined Mr. Sperandeo and opined that he was suffering from postconcussion syndrome. Dr. Glista, a neurologist who treated Mr. Sperandeo, opined that Mr. Sperandeo suffered a concussion or closed head injury. However, Dr. Glista noted that Mr. Sperandeo's MRI did not show the "deep white matter" that one would see in someone who had sustained "a severe closed head injury." R.14, Ex.B at 389. Additionally, neither Dr. Wolf nor Dr. Glista placed permanent limitations on Mr. Sperandeo's return to work. In fact, Dr. Glista noted in March 2002 that Mr. Sperandeo's

"prolonged symptoms are really a bit out of proportion" to the head injury that he sustained. *Id.* at 392. In May 2002, Dr. Glista stated that he "really was reluctant to put [Mr. Sperandeo] off work from a neuropsychiatric point of view," and that Mr. Sperandeo "must make an attempt to return to work if they are willing to take him back." *Id.* at 395. Dr. Glista further noted that Mr. Sperandeo's return to work was "really more of an administrative issue than a direct medical issue." *Id.* In June 2002, Dr. Glista filled out a CNA form in which he stated that Mr. Sperandeo is "[n]ot unfit to work from primary neuro indication." *Id.* at 474.

Mr. Sperandeo also relies on medical records from Dr. Dennis Moore, an otologist-neurologist, and from Dr. Lewis, an internist. Dr. Moore diagnosed Mr. Sperandeo with "post traumatic disequilibrium." *Id.* at 485. In a June 2002 communication with CNA, Dr. Moore marked "no" in response to the question: "Does [Mr. Sperandeo] have mental or nervous limitations?" *Id.* at 486. He wrote CNA a letter in September 2002 stating that Mr. Sperandeo was under his care for "dizziness and disequilibrium" and a "bilateral inner ear dysfunction." *Id.* at 124. Dr. Moore asked CNA to "take this information into consideration" when determining whether Mr. Sperandeo should receive benefits under the CNA policy. *Id.* However, Dr. Moore dictated no permanent work restrictions.[6]

Dr. Lewis, an internist who had been Mr. Sperandeo's physician for eleven years, wrote a letter in which he expressed the view that "it is not appropriate for [Mr. Sperandeo] to be working in his current occupation . . . .

---

[6] However, Dr. Moore did opine that Mr. Sperandeo should not work until Dr. Moore's assessment, including testing by Dr. Hain, was complete. *See* R.14, Ex.B at 127.

I feel he is unsafe because of dysequilibrium [sic], shoulder and back pain." *Id.* at 145.

Some physicians also remarked on Mr. Sperandeo's lack of effort during examinations, and his possible exaggeration of symptoms. For example, Dr. Randolph, a neuropsychologist who examined Mr. Sperandeo, stated that Mr. Sperandeo's "effort was felt to be questionable at times." *Id.* at 441. He noted specific instances of this questionable effort, including Mr. Sperandeo's effort on a memory test during which he "performed at chance levels on this test, which is extremely easy to complete with a high degree of accuracy, even for subjects who have sustained severe traumatic brain injury." *Id.* at 442. Dr. Randolph stated that "[t]his is very clear evidence of an attempt to feign or exaggerate memory impairment," and that it calls into question the other test results. *Id.* at 442. Dr. Randolph opined that it is "highly unlikely that there is any significant underlying cognitive impairment." *Id.* at 444.

Dr. Moore also referred Mr. Sperandeo to Dr. Timothy Hain, an otoneurologist, for testing. Dr. Hain performed a number of tests on Mr. Sperandeo and wrote that the testing "documents severely impaired balance," and that the most likely explanation for the test results is "aphysiologic." *Id.* at 161. A CNA nurse reviewing Mr. Sperandeo's claim for benefits called the hospital where Dr. Hain's testing had been performed and asked a technician what "aphysiologic" means; the technician explained that an "[a]physiologic score usually means the patient is exaggerating their complaints of dizziness and imbalance." *Id.* at 170.[7]

---

[7] Mr. Sperandeo invites our attention to *Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 917 (7th Cir. 2003),

(continued...)

Therefore, the vast majority of the medical evidence evaluated by CNA did not indicate that Mr. Sperandeo would be unable to "continuously perform the substantial and material duties" of his job. R.14, Ex.B at 13. Drs. Wolf, Moore, Hain and Randolph each placed no restrictions on Mr. Sperandeo's return to work. Dr. Glista, his treating neurologist, expressed a desire to get Mr. Sperandeo to return to work. This evidence is bolstered by Dr. Hain's and Dr. Randolph's view that Mr. Sperandeo

---

[7] (...continued)
and submits that the treating physician's diagnosis should be given more weight than the opinion of the insurance plan's medical consultant because the treating physician would have superior information. Specifically, Mr. Sperandeo argues that CNA should not have relied on their nurse's interpretation of "aphysiologic," rather than the opinions of his treating physicians, especially Dr. Lewis.

Mr. Sperandeo's argument is flawed for a number of reasons. First, *Hawkins* was decided prior to the Supreme Court's decision in *Nord v. Black & Decker Disability Plan*, 538 U.S. 822, 825, 831 (2003), in which the Court rejected the notion that plan administrators are obliged to accord special deference to the opinions of treating physicians. Moreover, CNA did not deny Mr. Sperandeo benefits solely on its nurse's investigation of the meaning of the word "aphysiologic." Rather, it reviewed the records of various specialists who did not place restrictions on Mr. Sperandeo's return to work, as well as physicians who believed that Mr. Sperandeo may have been exaggerating his symptoms. Finally, even if we were to give some kind of deference to Mr. Sperandeo's treating physicians, as Mr. Sperandeo requests, it is Mr. Sperandeo's own treating neurologist who opined that Mr. Sperandeo's return to work was more of an "administrative issue" than a medical issue and that Mr. Sperandeo is "[n]ot unfit to work from primary neuro indication." R.14, Ex.B at 395, 474.

may have been exaggerating his symptoms.

Other evidence supporting the conclusion that Mr. Sperandeo was not disabled due to his neurological condition included a behind-the-wheel evaluation of Mr. Sperandeo on April 24, 2002. The evaluator concluded that Mr. Sperandeo could return to independent driving with no identified restrictions. Additionally, Dr. Denise Fiducia, a psychologist, recommended that Mr. Sperandeo "[c]onsider a vocational counselor to facilitate a successful transition back to work." *Id.* at 381. She also expressed the view that, although some of his early symptoms were "most likely attributable to direct neurological insult," over time symptoms such as Mr. Sperandeo's "can be maintained or exacerbated by secondary symptoms such as pain or emotional distress."[8] *Id.*

The only physician who opined that Mr. Sperandeo could not return to work based on his neurological condition was Dr. Lewis. However, Dr. Lewis was an internist. By contrast, the various physicians who did not place restrictions on Mr. Sperandeo's return to work were specialists in the field of neurology: neurologists, an otoneurologist and a neuropsychologist.[9] Therefore, given the opinions of the

---

[8]  While some of Mr. Sperandeo's physicians opined that some of his symptoms may be caused by psychological issues, Mr. Sperandeo did not submit a claim based on any psychological impairment.

[9]  Mr. Sperandeo also argues that CNA should have referred his claim to an independent medical expert for review before denying his claim based on CNA's "perceived inconsistencies among the medical reports." Appellant's Br. at 22-23. However, "[i]nsurers remain free (as do judges) to resolve conflicts in the

(continued...)

various specialists who examined Mr. Sperandeo, CNA's decision to deny benefits on the ground of neurological impairment was correct.

## Conclusion

For the foregoing reasons, the judgment of the district court is affirmed in part and reversed in part. We remand for further proceedings consistent with this opinion. The parties shall bear their own costs on appeal.

AFFIRMED in part;
REVERSED and REMANDED in part

---

[9] (...continued)
medical submissions." *Wallace v. Reliance Standard Life Ins. Co.*, 318 F.3d 723, 724 (7th Cir. 2003). Additionally, we have stated that obtaining an independent medical examination is "an option, not an obligation," for plan administrators. *Id.* In any event, many of Mr. Sperandeo's own physicians did not limit his ability to return to work. *See id.* ("No case of which we are aware holds that, when a plan participant's own doctors opine that he is again able to work, the insurer . . . must refer the participant to additional physicians in quest of one who will find a disabling condition.").

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*