Pamela NULL, Plaintiff–Appellant,

v.

COMMUNITY HOSPITAL ASSOCIA-
TION; Life Insurance Company of
North America, Defendants–Appellees.

No. 09–6125.

United States Court of Appeals,
Tenth Circuit.

May 12, 2010.

Rex D. Brooks, Esq., Rex D. Brooks,
Attorney at Law, Oklahoma City, OK, for
Plaintiff–Appellant.

Timothy A. Carney, Esq., Erin K. Dai-
ley, Esq., Jennifer Motwani Hurley, Esq.,
Gablegotwals, Tulsa, OK, for Defendants–
Appellees.

Before KELLY, BALDOCK, and
HOLMES, Circuit Judges.

## ORDER AND JUDGMENT[*]

JEROME A. HOLMES, Circuit Judge.

Plaintiff–Appellant Pamela Null appeals
the district court's adjudication of her
claim for long-term disability (LTD) bene-
fits and waiver of life insurance premiums
under the Employee Retirement Income
Security Act of 1974 (ERISA), 29 U.S.C.
§§ 1001–1461. On appeal, Ms. Null con-
tends that defendants' termination of both
her long-term disability (LTD) benefits
and the waiver of life insurance premiums
was not supported by substantial evidence
and that the decision was unreasonable,
arbitrary, and capricious. Specifically
with respect to the LTD benefits, Ms. Null
argues that defendants should have ob-
tained vocational information about jobs
available to her before terminating her
benefits, and that they improperly relied

on hearsay evidence of her medical condition to justify their decision to terminate. We have jurisdiction under 28 U.S.C. § 1291. Because we conclude that, under the circumstances of this case, consideration of vocational expert evidence is necessary, we reverse.

*Background*

Defendants are (i) Community Hospital Association, d/b/a Boulder Community Hospital, Ms. Null's former employer and the plan administrator of an employee-welfare-benefits plan (Plan), as defined by ERISA, and (ii) Life Insurance Company of North America (LINA) which issued life insurance and long-term disability policies to defendant Community Hospital Association to provide benefits to Boulder Community Hospital's eligible employees under its Plan. LINA made the decision to pay benefits to Ms. Null and to eventually terminate those benefits.

For approximately twenty years, Ms. Null was employed as a registered nurse by Community Hospital Association at the Boulder Community Hospital. In July 2002, Ms. Null applied for disability benefits, claiming severe, diffuse pain in various parts of her body. In August, she was diagnosed with persistent myalgia, Aplt. App. Vol. 6 at 601382, and was later diagnosed with chronic pain syndrome, *id.* Vol. 5 at 501213, and rheumatoid arthritis, *id.* Vol. 4 at 400959. In September 2000, LINA approved Ms. Null's LTD application and a few months later granted her waiver of life insurance premiums (WOP) for the duration of her disability. Almost six years later, LINA terminated the LTD and WOP benefits, based partly on infor-

mation that one of Ms. Null's treating physicians, Dr. Robert Hynd, had released her to work.

*Discussion*

*Standard of Review*

After two unsuccessful appeals of the benefits determination, Ms. Null brought this action under 29 U.S.C. § 1132(a)(1)(B) asserting that the termination was arbitrary and capricious.[1] The district court began its analysis by determining the standard of review. "When, as here, the district court's determination of the standard of review did not require it to resolve any disputed historical facts, we do not defer to its determination but decide de novo what the standard of review should be." *Hancock v. Metro. Life Ins. Co.,* 590 F.3d 1141, 1146 (10th Cir.2009). We review "a denial of benefits challenged under § 1132(a)(1)(B) … under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989).

Because the plan language failed to confer discretion upon LINA, as an assumed plan fiduciary,[2] to determine whether a plan participant is disabled and eligible for LTD benefits, LINA's decision to terminate Ms. Null's LTD benefits is reviewed de novo. *Id.* Under that standard, the court's role is to determine whether LINA made a correct decision based upon the administrative record before it when the decision was made. *See Sperandeo v. Lor-*

1. 29 U.S.C. § 1132(a)(1)(B) provides that
   A civil action may be brought—
   **(1)** by a participant or beneficiary—
   . . . .
   **(B)** to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify

   his rights to future benefits under the terms of the plan.

2. The district court made the unchallenged assumption, without deciding, that LINA was a fiduciary with respect to the plan. We will also proceed under that assumption.

*illard Tobacco Co.*, 460 F.3d 866, 872 (7th Cir.2006).

In contrast to LINA's lack of discretion when considering LTD benefits, the life-insurance component of the plan afforded LINA discretion to decide questions of eligibility for coverage or benefits under the plan and to make any related findings of fact. Because LINA had this discretion, we review the decision to terminate the WOP benefit under the arbitrary and capricious standard, meaning that we are limited to determining whether the decision was reasonable and made in good faith. *Kellogg v. Metro. Life Ins. Co.*, 549 F.3d 818, 825–26 (10th Cir.2008). "We review a plan administrator's decision to deny benefits to a claimant, as opposed to reviewing the district court's ruling." *Holcomb v. Unum Life Ins. Co. of Am.*, 578 F.3d 1187, 1192 (10th Cir.2009).

*Hearsay*

One of the reasons LINA cited as a basis upon which to terminate Ms. Null's benefits was a reported telephone conversation between its medical director, Dr. Manolakas, and Ms. Null's rheumatologist, Dr. Hynd, in which the latter purportedly stated that Ms. Null was physically able to return to work.[3] Ms. Null argues that LINA's reliance on this alleged conversation is impermissible as it is based upon multiple hearsay.

The district court rejected this argument, citing cases holding that a plan administrator is not a court of law and thus is not bound by the rules of evidence, *see, e.g., Speciale v. Blue Cross & Blue Shield Ass'n*, 538 F.3d 615, 622 n. 4 (7th Cir. 2008); *Karr v. Nat'l Asbestos Workers Pension Fund*, 150 F.3d 812, 814 (7th Cir. 1998), an issue not yet addressed in this circuit. The court also noted, however,

that LINA's disability decision was not based solely on Dr. Manolakas's conversation with Dr. Hynd and that, therefore, the fact that Dr. Hynd's statement may have been hearsay would not completely undermine LINA's decision if, based on other evidence, it ultimately proved correct. We agree that LINA's disability decision cannot be overturned simply because part of the evidence relied upon to reach it may have been based on hearsay. Because the written record included an opinion from Dr. Hynd that Ms. Null could return to work as long as she continued taking her medication and observed standing and lifting restrictions, Aplt. App. Vol. 3 at 300618, Ms. Null cannot prevail on her hearsay argument.

*Proof of Ms. Null's ability to do other work*

Because LINA had paid LTD benefits to Ms. Null for more than twenty-four months, the Plan provided that she would be considered disabled "if [her] Injury or Sickness makes [her] unable to perform all the material duties of any occupation for which [she] may reasonably become qualified based on education, training or experience [the "any occupation" standard], or solely due to Injury or Sickness, [she is] unable to earn more than 80% of [her] Indexed Covered Earnings." Aplt. App. Vol. 7 at 701503. The term "Sickness" is defined as "a physical or mental illness." *Id.* at 701504.

Ms. Null argues that termination of her LTD benefits was incorrect because there is no evidence in the administrative record of any occupations available to her, given her education, training, or experience, nor is there any proof that she was able to obtain employment with a salary equal to

---

**3.** Dr. Manolakas requested that Dr. Hynd reduce his opinion to writing, but Dr. Hynd did not respond to that request.

80% of her Indexed Covered Earnings, or $3,620.61 per month. *Id.* Vol. 3 at 300674.

In holding that LINA rightfully terminated Ms. Null's LTD benefits, the district court found that

[t]he medical records in the administrative record dating from October 2005 through May of 2006 do not show that plaintiff, by reason of her rhematoid [sic] arthritis, arthralgia and/or myalgia, was unable to perform all of the material duties of any occupation for which plaintiff was or might have reasonably become qualified based upon her education, training or experience or that solely due to her arthritis, arthralgia and/or myalgia she was unable to earn more than 80% of her Indexed Covered Earnings.

Aplt. App. Vol. 7 at 701560. Ms. Null argues that medical records alone could not establish her ability to perform different occupations and that the testimony of a vocational expert was required to establish that fact. She asserts that it was LINA's obligation to secure such evidence.

Normally, with an initial disability claim, the plaintiff has the burden of establishing that she is unable to perform in any occupation. *Torix v. Ball Corp.*, 862 F.2d 1428, 1431 (10th Cir.1988) (holding that a claimant is required "to establish a physical inability to follow any occupation from which he can earn a reasonably substantial income rising to the dignity of an income or livelihood, although the income may not be as much as was earned prior to the disability"). There is authority, however, that the burden shifts when the plan administrator is attempting to terminate benefits. *See Gunderson v. W.R. Grace & Co. Long Term Disability Income Plan*, 874

F.2d 496, 499 & n. 4 (8th Cir.1989) (holding that "before terminating benefits, the Plan should have obtained a vocational expert's opinion to determine if [claimant] is presently capable, in light of his physical impairment, to perform 'any occupation'" and observing that claimant met his burden when he proved his disability initially); *see also Quinn v. Blue Cross & Blue Shield Ass'n*, 161 F.3d 472, 476 (7th Cir. 1998) (requiring plan administrator in termination case "to determine whether [claimant] was capable of performing another job with a salary level similar to her current job").[4] In either instance, at least in this circuit, "the plan administrator has a fiduciary duty to the insured to conduct an investigation and to seek out the information necessary for a fair and accurate assessment of the claim." *Rasenack ex rel. Tribolet v. AIG Life Ins. Co.*, 585 F.3d 1311, 1324 (10th Cir.2009). Specifically with regard to this case, the plan administrator is responsible for gathering enough evidence to demonstrate that Ms. Null is able to perform other occupations. *See Caldwell v. Life Ins. Co. of N. Am.*, 287 F.3d 1276, 1290 (10th Cir.2002).

In *Caldwell*, involving the same insurer defendant as the case at bar, this court construed a definition of disability substantially identical to the one here. It considered, as a matter of first impression, whether a plan administrator must consider vocational evidence when assessing a claim for disability benefits under an "any occupation" standard.

The court noted, in general, that

[d]etermining whether a claimant's disability is so serious as to prevent him from performing, under LINA's stan-

4. We note that LINA's life insurance policy requires the insured to prove continuing disability in order to avoid termination of the WOP benefit. *See* Aplt. App. Vol. 2 at 200247 The disability plan is more equivocal regarding the burden to prove eligibility for continuation of disability benefits, noting only that "[w]e will require continued proof of your Disability for benefits to continue." *Id.* Vol. 7 at 701494.

dard, "any occupation for which he is or may reasonably become qualified based on his education, training, or experience," requires a complicated evaluation of a claimant's abilities, skills, and education as well as an assessment of the labor market in the claimant's geographic region. Vocational evidence—most typically from a vocational expert—regarding how the employee's impairment [a]ffects his ability to perform jobs other than that held prior to the onset of disability is often helpful in making this evaluation.

*Id.* at 1289 (citation omitted).

*Caldwell* rejected the plaintiff's contention that a plan administrator must always consider vocational evidence when assessing a claim for disability benefits under an "any occupation" standard, holding instead that

whether a claims administrator must consider vocational or occupational evidence in reaching its determination to deny a claimant "any occupation" benefits depends on the circumstances of the particular case and the terms of the benefits plan. If a claims administrator can garner substantial evidence to demonstrate that a claimant is, in fact, able to perform other occupations (within the definition set out by the insurer) in the open labor market, then consideration of vocational expert evidence is unnecessary.

*Id.* at 1290. Thus the determination of whether vocational or occupational assessment is required is decided on a case-by-case basis. *Id.* at 1289.

LINA argues that, because there was substantial medical evidence that Ms. Null's physical condition had improved, it was justified in terminating her benefits on that basis alone, without reference to any vocational employment data. We disagree and hold that, given the circumstances of this case, *Caldwell* requires "the consider-

ation of vocational expert evidence," *id.* at 1290.

The "circumstances" of this case include two categories of evidence: medical evidence favoring both parties, and vocational evidence, largely favorable to Ms. Null. We will briefly summarize the medical evidence, which the district court discussed in detail. Ms. Null was approved for LTD benefits beginning in August 2000. By 2003, new medication was helping significantly, and Ms. Null was anticipating returning to work. Aplt. App. Vol. 4 at 400935. In 2005, a Functional Capacity Evaluation determined that Ms. Null could perform medium work for eight hours per day with a twenty-pound lifting restriction. *Id.* Vol. 3 at 300678.

In October 2005, Ms. Null's primary care physician, Dr. Shaw, indicated that her rheumatoid arthritis was stable, her pain control was adequate, and that she could work, albeit for only three hours per day initially and ten to twelve hours per week ultimately. *Id.* at 300666–67; 300646. In February 2006, Dr. Shaw, noting Ms. Null's joint inflammation, pain, and movement restrictions, stated that she could work four hours per day with no repetitive bending, kneeling, or lifting. *Id.* Vol. 3 at 300633.

In March 2006, Dr. Hynd, Ms. Null's rheumatologist, reported that, while Ms. Null had problems with her lower back, her arthritis was in remission as long as she remained on Humira and that nothing prevented her return to work, with standing and lifting restrictions. *Id.* at 300618.

After her benefits were denied, Ms. Null saw Dr. Raul Romea, a rheumatologist with the Orthopedic Institute in Oklahoma City. Upon his initial examination in December 2006, Dr. Romea noted Ms. Null's history of rheumatoid arthritis which he "[was] not convinced [was] active at the moment," and found no significant synovi-

tis.[5] *Id.* Vol. 2 at 200416. Two months later, in February 2007, however, Dr. Romea stated in writing that "Pam Null has Rheumatoid arthritis that is in active stage. I recommend Ms. Null work part-time sedentary for 4–6 hours a day." *Id.* Vol. 3 at 300505. In April 2007, Dr. Romea noted some synovitis in Ms. Null's left ankle. *Id.* at 200360. By December of that year, an orthopedic surgeon specializing in foot and ankle surgery examined Ms. Null in connection with her "rheumatoid feet" and recommended surgical treatment. *Id.* Vol. 2 at 200306.

Ms. Null has also been under the care of Dr. Jacob Schwartz, a pain management specialist, since early 2003. Her records show long-term use of prescription narcotic pain medication beginning in 2003 with a ten-month course of oxycontin. *Id.* at 200439. Dr. Schwartz then switched her to methadone which she continued to take on a daily basis through the date LINA terminated her benefits. *Id.* at 200436–439.

LINA cites cases in which courts have affirmed the denial or termination of benefits without the benefit of vocational evidence. *See, e.g., Morales–Alejandro v. Med. Card Sys., Inc.,* 486 F.3d 693 (1st Cir.2007); *Duhon v. Texaco, Inc.,* 15 F.3d 1302 (5th Cir.1994); *Block v. Pitney Bowes Inc.,* 952 F.2d 1450 (D.C.Cir.1992). We do not doubt that there are circumstances in which such evidence is not necessary. Indeed, as we recognized in *Caldwell,* the matter is one for case-by-case determination. Where there is persuasive medical evidence that no disability exists, vocational evidence is considered unnecessary. In this case, however, the medical evidence is contradictory and far less clear than LINA suggests.

In addition to the medical evidence, the circumstances of this case include extensive evidence, much of it generated by LINA itself, that Ms. Null is unable to work at any occupation and is therefore disabled. After her benefits were terminated, Ms. Null secured the opinion of a rehabilitation consultant who reviewed her medical record, administered various occupational tests, and concluded that she "does not possess any significant transferrable job skills to sedentary type of work." Aplt. App. Vol. 2 at 200373. The consultant agreed with the Social Security Administration "that Ms. Null is economically unemployable and unable to return to the workforce in any occupation for which she is qualified as a result of her age, education, work history, test scores, medical information and limitations from her impairments." *Id.* at 200374.

In addition, LINA's own internal vocational specialists agree that Ms. Null is unable to perform any occupation. In 2005, Margie Munoz, a vocational rehabilitation counselor employed by LINA, concluded that, despite a functional capacity evaluation that assessed her as able to perform full-time medium work with a twenty-pound lifting restriction, she could find no suitable positions that would meet Ms. Null's skills, education, work history, and wage-replacement requirements. *Id.* Vol. 3 at 300673. Later that year, the same evaluator again concluded that, based on her lack of computer skills and education, there were no jobs that would meet Ms. Null's wage requirements. *Id.* Vol. 1 at 100140. Also during 2005, Ms. Null's primary care physician stated that she could not work. *Id.* at 100159.

In February 2006, LINA again commissioned an internal transferrable skills assessment. This time, the assessor, Alan

---

**5.** Synovitis is the "[i]nflammation of a synovial membrane, especially that of a joint[.]" Stedman's Medical Dictionary 1773 (27th ed. 2000).

Ely, stated that the "[f]ile is not a good potential RTW (return to work)" because the medical information and limitations-and-restrictions documentation needed to be updated. *Id.* at 100124. On May 1, 2006, presumably after having received the additional data, Mr. Ely concluded that there were "no occupations that the claimant could reasonably be expected to perform in the Oklahoma City labor market." *Id.* at 100117. Some 3½ months later, LINA terminated Ms. Null's benefits.

None of this negative vocational information is discussed in LINA's two denials of Ms. Null's appeals. While the district court referred to the evidence, it did not analyze it with reference to the question of Ms. Null's disability. As mentioned, the court concluded that Ms. Null's medical records did not show an inability to perform any occupation or that, solely due to her impairments, she could not earn more than 80% of her Indexed Covered Earnings. That conclusion, however, was not based on evidence of available occupations, plaintiff's qualifications or work potential, or possible salaries in the relevant market. *See Caldwell,* 287 F.3d at 1289.

LINA could only avoid having to engage a vocational expert if it "could garner substantial evidence to demonstrate that [Ms. Null] is, in fact, able to perform other occupations ... in the open labor market." *See id.* LINA has not garnered any information supporting such a conclusion; in fact, the weight of the evidence is to the contrary. Ignoring evidence relevant to a decision or failing to consider all the evidence in the record can lead to a conclusion that a benefits determination is arbitrary and capricious, *see id.* at 1284–86— that is, even more than just incorrect, which is the standard for de novo review. *See Gaither v. Aetna Life Ins. Co.,* 388 F.3d 759, 773 (10th Cir.2004) (holding that "fiduciaries cannot shut their eyes to readily available information when the evi-

dence in the record suggests that the information might confirm the beneficiary's theory of entitlement and when they have little or no evidence in the record to refute that theory"). Given that the Plan's operational definition of disability is completely dependent on whether a claimant can work at any occupation given his or her particular circumstances, LINA cannot base its decision that Ms. Null is not disabled solely on the basis of improvement in her medical condition.

LINA argues that, because disability has to be based on "injury or sickness," and because Ms. Null's condition has improved, she cannot be disabled (presumably because she is no longer "sick"). We acknowledge that there is evidence that Ms. Null's arthritis had improved for a time. There is also evidence, however, that it became active again shortly after Dr. Hynd noted the remission. In addition, Ms. Null continued to see her pain management specialist, Dr. Schwartz, and there is no evidence that her pain had lessened; in fact, she continued to take methadone for generalized pain. Further, if a plaintiff meets her burden, as Ms. Null has done here with her rehabilitation consultant's evidence that no jobs are available to her, "recovery may not be denied on the basis of overly restrictive interpretations of the plan's language." *Torix,* 862 F.2d at 1431.

"An ERISA fiduciary presented with a claim that a little more evidence may prove valid should seek to get to the truth of the matter." *Gaither,* 388 F.3d at 774–75; *see also Quinn,* 161 F.3d at 476 (reversing and remanding a benefits determination where, although the administrator was not obligated to "undergo a full-blown vocational evaluation of [claimant's] job[,]" she did need to "make a reasonable inquiry in[to] the types of skills [claimant] possess[ed] and whether those skills may be used at

another job that can pay her the same salary range as her [current] job").

*Conclusion*

As we held in *Caldwell,* we decide on a case-by-case basis whether a vocational or occupational assessment is required to resolve a challenge to a benefits determination. We find this case to be one requiring such evidence. We therefore REVERSE the district court's determination as to Ms. Null's LTD and WOP benefits claims and REMAND to the district court with instructions that it REMAND the matter to the LINA claims administrator for further findings of fact pursuant to the Plan's standard for "any occupation" disability. LINA's motion to strike new argument in appellant's reply brief is DENIED as moot. In view of our remand, we DENY Ms. Null's request for attorney's fees and costs, presumably made under § 1132(b)(1), as unripe because several of the factors used in determining the appropriateness of such an award cannot be ascertained until LINA redetermines Ms. Null's right to benefits. *See Graham v. Hartford Life & Accident Ins. Co.,* 501 F.3d 1153, 1163 (10th Cir.2007).

\* After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. *See* Fed. R.App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.