In the

# United States Court of Appeals
## For the Seventh Circuit

---

No. 06-3822

HUGO DIAZ,

*Plaintiff-Appellant,*

v.

PRUDENTIAL INS. CO. OF AMERICA,

*Defendant-Appellee.*

---

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 C 2702—**Charles R. Norgle, Sr.**, *Judge.*

---

ARGUED APRIL 5, 2007—DECIDED AUGUST 23, 2007

---

Before EASTERBROOK, *Chief Judge*, and BAUER and WOOD, *Circuit Judges.*

WOOD, *Circuit Judge.* This is the second time this court has had to review a decision rejecting Hugo Diaz's application for benefits under his company's group insurance long-term disability plan (the "LTD Plan"). After Prudential Insurance Company of America ("Prudential"), the LTD Plan's underwriter, denied Diaz's initial application for the benefits and two appeals of that denial, Diaz sued Prudential under § 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B). The district court granted summary judgment to Prudential, but we reversed and remanded, concluding that the district court should not

have used the abuse-of-discretion standard in evaluating Prudential's decision. See *Diaz v. Prudential Ins. Co. of America*, 424 F.3d 635, 640 (7th Cir. 2005) (*Diaz I*). Looking at Diaz's claim *de novo*, the district court once again found that Diaz could not prevail and thus that Prudential was entitled to summary judgment.

Our review of that judgment is *de novo*. We conclude that Diaz introduced enough evidence to create a dispute of material fact about whether he was disabled for purposes of the LTD Plan. This evidence includes Diaz's own accounts of his pain, the observations of his physical therapist, and the opinions of at least three different doctors. The time has come to try this case; we reverse and remand for that purpose.

# I

As we noted in *Diaz I*, Diaz began working in 1998 as a computer analyst at Bank One in Chicago. (Bank One has since been taken over by JPMorgan Chase, but for convenience we refer to it under the name it had during Diaz's employment.) As a Bank One employee, he participated in a group disability insurance plan underwritten by Prudential. The plan included long-term disability coverage.

In 2000, Diaz began experiencing persistent lower back pain; he was diagnosed with degenerative disc disease and radiculopathy. For about two years, he underwent a series of medical treatments including lumbar epidural steroid injections, physical therapy, and pain medication. His condition compelled him to stop working on January 31, 2002. Four days later, on February 4, Diaz underwent a lumbar fusion procedure with hardware implantation to correct an annular tear at the lumbosacral joint (L5-S1). Although postoperative examinations showed that the

hardware alignment was satisfactory and there were no neurological deficits in his lower extremities, Diaz continued to report varying levels of pain in his back and legs. His doctors could not find anything related to the operation that might have been causing this pain. After months of ineffective physical therapy and pain medication, he concluded that he could not return to work.

Diaz submitted a claim for benefits under the LTD Plan on July 22, 2002, alleging that the back pain had rendered him disabled as of February 4. He supported his application with several doctors' notes expressing the opinion that his condition prevented him from sitting for more than fifteen to twenty minutes at a stretch. Prudential denied the claim on August 27 on the ground that his reported inability to perform his job was not consistent with the medical evidence. Diaz sought reconsideration of the rejection and supported his request with additional medical evidence, but Prudential upheld its negative decision on January 22, 2003. After Diaz filed a second appeal, Prudential submitted his medical documentation to its medical consultant, Dr. Gale Brown, for review. Although Dr. Brown did not personally examine Diaz, she opined based on Diaz's medical records that the clinical and diagnostic evidence relating to Diaz's lumbar spine condition did not support Diaz's reports of persistent pain. She concluded that while Diaz had a "temporary musculoskeletal impairment related to L5-S1 fusion from 1/2002 through 8/05/02," subsequent to August 5, Diaz's condition did not prevent him from performing his job on a full-time basis. Dr. Brown noted, however, that there were non-physical factors that were having an adverse impact on Diaz's ability to engage in gainful employment, including his anxiety over losing his job, depression, and opioid dependency. Diaz was not seeking benefits on any of those bases. On April 16, 2003, Prudential again upheld its decision denying Diaz benefits.

Diaz filed this action in district court on April 22, 2003, challenging Prudential's adverse decision. On May 12, 2004, the district court granted summary judgment in favor of Prudential, finding that Prudential's denial of benefits was not arbitrary or capricious. Diaz appealed, and we reversed because the district court applied the wrong standard of review. See *Diaz I*, *supra*. We found that Bank One's LTD Plan was one that merely required the plan administrator "to make a judgment within the confines of pre-set standards," and thus that the proper approach under *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989), is *de novo*. *Diaz I*, 424 F.3d at 639-40. We remanded the case to the district court for a fresh look from that perspective. *Id.* at 640.

On remand, both parties again moved for summary judgment. After summarizing the conclusions and reasoning of the medical professionals who evaluated Diaz's claim for Prudential (none of whom had treated or examined him), the district court found Prudential's evidence compelling. Echoing Dr. Brown, it stated that Diaz had been "unable to submit reliable proof of both a continuing disability and treatment by a doctor." The emphasis here must have been on the word "reliable," because Diaz had in fact submitted a great deal of evidence. The court, however, was unimpressed by his evidence: "None of the x-rays, medical reports or physical therapist notes supported Diaz's claim of continued back pain. Plainly put, there is nothing that would prohibit Diaz from performing his duties at his job at Bank One on a full time basis beyond August 5, 2002." The court also criticized what it saw as the lack of expert testimony in the form of depositions that contradicted the evidence submitted by Prudential. It accordingly granted summary judgment in Prudential's favor.

## II

Normally, we would not belabor the question of the proper approach toward a motion for summary judgment under FED. R. CIV. P. 56, but for a time there was some confusion in this case about what the district court was being asked to do. At one point, the parties filed a stipulation that would have allowed the district court to conduct a "paper trial" and make findings of fact and conclusions of law under FED. R. CIV. P. 52. The parties also filed cross-motions for summary judgment under Rule 56. In the end, the court elected to dispose of the case on summary judgment, by granting the defendant's motion and denying plaintiff's. No one has made any complaint about that method of proceeding on appeal, and so we proceed as if the stipulation had never been made.

That means that we will review the district court's grant of summary judgment *de novo. Atterberry v. Sherman*, 453 F.3d 823, 825 (7th Cir. 2006). "Summary judgment is appropriate if 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Id*. (quoting FED. R. CIV. P. 56(c)). "When, as here, cross-motions for summary judgment are filed, we look to the burden of proof that each party would bear on an issue of trial; we then require that party to go beyond the pleadings and affirmatively to establish a genuine issue of material fact." *Santaella v. Metropolitan Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997). For claims seeking benefits under an ERISA plan, we have held that "at trial the plaintiffs would bear the burden of proving [the ERISA beneficiary's] entitlement to the benefits of the insurance coverage, and the defendant [insurer] would bear the burden of establishing [the beneficiary]'s lack of entitlement . . . ." *Id*.

The district court's task in engaging in *de novo* consider-ation of the decision of the plan administrator is not the same as its job in reviewing administrative determinations on the basis of the record the agency compiled under the substantial evidence rule, as it might do in a Social Security benefits case. See *Ramsey v. Hercules Inc.*, 77 F.3d 199, 205 (7th Cir. 1996). Some of the confusion in this area may be attributable to the common phrase "*de novo* review" used in connection with ERISA cases. In fact, in these cases the district courts are not *reviewing* anything; they are making an independent decision about the em-ployee's entitlement to benefits. In the administrative arena, the court normally will be required to defer to the agency's findings of fact; when *de novo* consideration is appropriate in an ERISA case, in contrast, the court can and must come to an independent decision on both the legal and factual issues that form the basis of the claim. What happened before the Plan administrator or ERISA fiduciary is irrelevant. See *Patton v. MFS/Sun Life Financial Distributors, Inc.*, 480 F.3d 478, 485-86 (7th Cir. 2007). That means that the question before the district court was not whether Prudential gave Diaz a full and fair hearing or undertook a selective review of the evidence; rather, it was the ultimate question whether Diaz was entitled to the benefits he sought under the plan. See *Wilczynski v. Kemper Nat. Ins. Companies*, 178 F.3d 933, 934-45 (7th Cir. 1999).

In construing the terms of the plan, we employ federal common law rules of contract interpretation. See *Life Ins. Co. of North America v. Von Valtier*, 116 F.3d 279, 283 (7th Cir. 1997). Under those rules we are to "interpret the terms of the policy in an ordinary and popular sense, as would a person of average intelligence and experience, and construe all plan ambiguities in favor of the insured. Plan language may only be deemed ambiguous where it is

subject to more than one reasonable interpretation." *Santaella*, 123 F.3d at 461 (quotations omitted).

There is no dispute over what Bank One's LTD Plan requires. The LTD Plan uses two definitions for disability—one that applies to the first 24 months, and another for disabilities that continue beyond 24 months. This case began as one involving only Diaz's ability to satisfy the former definition, which reads as follows:

> You are disabled when Prudential determines that: you are unable to perform the material and substantial duties of your regular occupation due to your sickness or injury; and you have 20% or more loss in your indexed monthly earnings due to that sickness or injury.

2001 Benefit Options Answer Book and Enrollment Kit at 30 ("*Answer Book*"); Long Term Disability Coverage at 10 ("*LTD Coverage*"). "Material and substantial duties" are defined as "duties that: are normally required for the performance of your occupation; and cannot reasonably be omitted or modified . . . ." *Id*. In addition, "[r]egular occupation means the occupation you are routinely performing when your disability begins. Prudential will look at your occupation as it is normally performed instead of how the work tasks are performed for a specified employer at a specific location." *Id*. Finally, "[i]njury means a bodily injury that is the direct result of an accident and not related to any other cause. Injury which occurs while you are under the plan will be treated as a sickness." *Id*. at 11; see also *id*. at 10 ("Sickness means any disorder of your body or mind, but not an injury . . . ."). Under the Plan, the burden is on the claimant to provide proof of a claim. That proof must include, among other things, "(4) [a]ppropriate documentation of the disabling disorder[, and] (5) [t]he extent of your disability, including restrictions and limitations preventing you from perform-

ing your regular occupation . . . ." *LTD Coverage* further notes that Prudential "may request you send proof of continuing disability, satisfactory to Prudential, indicating that you are under the regular care of a doctor.*" Id.* at 22.

As many plans do, the Bank One LTD Plan shifts its focus from the employee's own job to the "inability to perform the essential functions of any gainful occupation" after the first 24 months have passed. *Answer Book* at 30; see also *LTD Coverage* at 10. Diaz, who has been receiving Social Security benefits since a favorable decision on July 24, 2003, on the ground that he is unable to engage in any substantial gainful activity, is also seeking the longer term benefits under the LTD Plan. (We recognize that the Social Security Act and the LTD Plan may use slightly different standards—the Plan speaks of "inability to perform the essential functions of any gainful occupation," while 42 U.S.C. § 423(d)(1)(A) defines disability as the "inability to engage in any substantial gainful activity by reason of any . . . physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." Those differences strike us as minor.) Just as evidence explaining an apparent inconsistency between an award of Social Security benefits and the ability to work for purposes of the Americans with Disabilities Act is relevant, see *Cleveland v. Policy Mgt. Sys. Corp.*, 526 U.S. 795, 801-07 (1999), evidence pointing to consistency between a Social Security decision and another ought to be taken into account.

There is no dispute over the physical requirements of Diaz's job. Diaz's own description of his job as a computer programmer-analyst was that it was "90% sitting." Prudential used the definition of "programmer-analyst" from the *Dictionary of Occupational Titles* in analyzing his job requirements, when it denied Diaz's second appeal:

> Under the Group Policy, the medical documentation surrounding Mr. Diaz's condition and symptoms is compared to the functions of his occupation as it is normally performed. According to the Dictionary of Occupational Titles, Mr. Diaz's regular occupation is considered sedentary. The US Department of Labor defines sedentary work as exerting up to 10 pounds of force occasionally and/or a negligible amount of force frequently to lift, carry, push, pull or otherwise move objects, including the human body. Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time. Jobs are sedentary in nature if walking and standing are required only occasionally and all other sedentary criteria are met.

See also "030.162-014 Programmer Analyst," *Dictionary of Occupational Titles* (4th ed. 1995), http://www.oalj.dol.gov/libdot.htm#definitions. Given this definition and job description, Diaz needed only to submit evidence that, if believed, would show that he could not "sit[ ] most of the time" in order to create a material dispute under the LTD Plan's terms.

Diaz has not tried to paint an entirely black picture of his health. He concedes, for example, that his surgery went as planned and that there were no problems with the alignment of the implanted hardware or with the fusion. In addition, his neurological function remained intact throughout the period in question. Prudential appears to believe that these facts alone are enough to refute any evidence tending to show that he is disabled. As Prudential's consultant Dr. Brown said, "[t]he medical evidence beyond this period does not support residual musculoskeletal or neurological impairment that would preclude Mr. Diaz from performing the essential duties of his own sedentary occupation on a full-time basis, with minor accommodation . . . ." Those facts, however, do not

exist in a vacuum. Prudential can prevail on summary judgment only if Diaz failed to submit evidence to the contrary. We turn, therefore, to the materials Diaz submitted, which fall into three general categories: his own testimony and behavior; the assessments of his condition and treatments ordered by the physicians who treated him; and the diagnostic tests performed by his physical therapist.

First, the record contains a great deal of evidence about Diaz's subjective assessment of his pain. Diaz's testimony cannot be discounted simply because it is "self-serving" or because it is not "medical" or "neurological" evidence. The Plan refers to "sickness or injury" in the definition of disability we quoted earlier; it then defines "sickness" as "any disorder of your body or mind, but not an injury." Later, in a section of the Plan addressing how long benefits will be paid, the Plan says that there is a 24-month cap on disabilities that "are primarily based on self-reported symptoms," which are described as "manifestations of your condition, which you tell your doctor [*sic*], that are not verifiable using tests, procedures and clinical examinations standardly accepted in the practice of medicine. Examples of self-reported symptoms include, but are not limited to headache, pain, fatigue, stiffness, soreness, ringing in ears, dizziness, numbness and loss of energy." These provisions erase any doubt that Diaz is entitled to benefits notwithstanding the fact that some of his evidence consists of subjective reports of his pain. Whether that evidence is the primary basis of his claim, whether his disability was in fact verified by the kinds of tests and procedures the Plan mentions, or whether the 24-month limit on the duration of benefits applies here, are questions that the district court must resolve on remand.

Diaz's testimony offers more than a long series of complaints spoken across the breakfast table. It demonstrates the kind of "long history of treatment" that we have found relevant in the past in comparable circumstances:

> What is significant is the improbability that [the claimant] would have undergone the pain-treatment procedures that she did, which included not only heavy doses of strong drugs such as Vicodin, Toradol, Demerol, and even morphine, but also the surgical implantation in her spine of a catheter and a spinal-cord stimulator, merely in order to strengthen the credibility of her complaints of pain and so increase her chances of obtaining disability benefits . . . .

*Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004) (citation omitted). Taken in the light most favorable to the plaintiff, the evidence of Diaz's repeated attempts to seek treatment for his condition supports an inference that his pain, though hard to explain by reference to physical symptoms, was disabling.

Second, the record contains the results of six diagnostic tests performed by Diaz's physical therapist, Melissa Kidder. The district court disregarded these tests because Dr. Brown, in reviewing the file, drew different conclusions. The court found that "tests administered by the physical therapist . . . cannot be reconciled with the clinical and diagnostic evidence such as x-rays and physical examinations." In extreme cases, diagnostic evidence presented in favor of one position may be ignored because of the overwhelming opinion of witnesses with greater specialization on the other side. See, *e.g.*, *Sperandeo v. Lorillard Tobacco, Inc.*, 460 F.3d 866, 875-76 (7th Cir. 2006) (finding no material issue of fact where only one internist thought that restrictions were necessary, while five specialists thought not). On the record in *Sperandeo*, we found the evidence supporting a finding of no disability so overwhelming that, as *Lindemann v. Mobil Oil Corp.* put it, "no reasonable jury would render a verdict for the opposing party if the record at trial were identical to the record compiled in the summary judgment proceeding." 141 F.3d 290, 294 (7th Cir. 1998).

This case is wholly unlike *Sperandeo*. While Dr. Brown may have had greater expertise than Physical Therapist Kidder, she did not actually examine Diaz. Dr. Brown noticed contradictions in Kidder's assessment of Diaz's neurological function, noting that none of the other physicians had said anything about the same neurological difficulties she was recording. (It was the absence of certain factors that created the conflict for Dr. Brown, not direct contradictions in the notes of other doctors.) Kidder's status as a physical therapist and the fact that some of her findings were not reflected in the reports of the other doctors goes to the weight of the evidence, however, not whether it was admissible or tended to support Diaz's case.

Finally, the district court gave no weight to the views of several other physicians on whose opinions Diaz relied. It dismissed the notes of the surgeon who had performed the spinal fusion and post-operative care, Dr. Howard An, asserting that Dr. An's "notes and letters to Bank One" were not those of an "expert medical witness" capable of "rebutting Prudential's assertions." It is unclear why the court took this view. Dr. An noted Diaz's back pain on numerous occasions and at different times prescribed various drugs designed to alleviate it, including Lortab, Ambien, Durgesic patches, Norco, Zanaflex, Kadian, and Neurontin. Diaz's file also contains the observations of other doctors: Dr. An; Dr. de la Cruz, Diaz's personal physician; Dr. Sandeep Amin, a pain-management specialist; and Dr. Jeffrey Kramer, a neurologist consulted about the possibility of implanting a spinal-cord stimulator. Such notes and letters can be sufficient to survive summary judgment. See *Patton*, 480 F.3d at 486-89.

This medical evidence supports Diaz's claim that he was disabled by the pain. We have drawn inferences from the fact that trained medical professionals responded to a claimant's call for help in the past, commenting on "the

improbability that [plaintiff] is a good enough actress to fool a host of doctors and emergency-room personnel into thinking she suffers extreme pain; and the (perhaps lesser) improbability that this host of medical workers would prescribe drugs and other treatment for her if they thought she were faking her symptoms." *Carradine*, 360 F.3d at 755. Although part of Diaz's need for treatment can be attributed to his addiction to painkillers, the treatment ordered by Drs. An and Amin, both of whom saw Diaz many times over the period in question, reflects their belief that his pain went beyond this addiction. Treatment included Dr. Amin's administering epidural steroids on October 22, November 8, November 22, and December 19, 2002, and on January 2, 2003, for the purpose of pain relief. This was a course of treatment supported by Dr. An. Moreover, when Dr. Kramer recommended the implantation of a spinal-cord stimulator, a procedure that Diaz did not undertake because of the significant risks, Dr. An did not blanch; rather, he "told the patient that that might be a good opportunity to decrease his pain and medication and improve his function."

The record also contains more direct assessments of Diaz's condition. Both Dr. Kramer and Dr. An concluded that the problems faced by Diaz were physiological. Dr. Kramer's notes on June 27, 2003, diagnosed Diaz with "failed back syndrome." Dr. An's notes on September 9, 2002, and February 25, 2003, highlighted multiple different physical sources that he believed could be causing Diaz's pain, including muscles, ligaments, and scar tissue.

Finally, Dr. An never stated that Diaz was fit to work; to the contrary, he concluded on multiple occasions that Diaz could not undertake even a sedentary occupation. On July 22, 2002, Dr. An noted in Diaz's benefit application that the patient was "unable to sit more than 20 minutes or walk > 5 Blocks," and indicated that the following restrictions were necessary: "No Repetitive Bending,

Twisting, Torque / No Sitting greater than 15 min, No Lift > 10 lb." He opined that Diaz could not do "sedentary" work. Similarly, on November 22, 2002, Dr. An noted that during an eight-hour day, Diaz could "stand and walk (with normal breaks)" or "sit (with normal breaks)" for "less than 2 hrs," a length of time insufficient for full-time work. Lastly, on February 25, 2003, Dr. An concluded, "I believe that [Diaz']s condition is significantly impaired and he is not able to work at this time." Under those conditions, notwithstanding the fact that he could sometimes sit or sometimes stand or sometimes walk, he could not perform either his regular duties or the duties of any sedentary job.

In deciding that the undisputed evidence demonstrated that Diaz was not disabled, the district court "failed to consider the difference between a person's being able to engage in sporadic activities and her being able to work eight hours a day five consecutive days of the week." *Carradine*, 360 F.3d at 755. In doing so, it ignored the dispute of material fact about Diaz's capacity to do the latter. As a result, its grant of summary judgment cannot stand.

\* \* \*

The judgment of the district court is REVERSED and the case is REMANDED for further proceedings consistent with this opinion. Circuit Rule 36 shall apply on remand.

A true Copy:

Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*