Honorable Thomas M. Durkin, United States District Judge
On January 13, 2016, Plaintiff Kathy Ferrin sued Defendant Aetna Life Insurance Company seeking payment of long-term disability benefits pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B). Specifically, Ferrin appeals Aetna's denial of her long-term disability ("LTD") benefits relating to her back and hip pain. Currently pending before the Court are the parties' motions for judgment. R. 85, 88.
The Court has carefully considered the arguments and evidence presented by the parties and, for the reasons set forth below, overturns Aetna's denial of LTD benefits from August 1, 2014. The following constitutes the Court's Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a). All findings are made by a preponderance of the evidence unless otherwise noted.
Findings of Fact
Ferrin began working for Southwest Airlines on or about July 13, 1992. R. 84 ("AR") at 270.[1] Aetna issued a group disability policy (the "Policy") on behalf of Southwest, which provided long-term disability benefits to eligible employees.
*913 A. The Policy
The policy provides a monthly benefit for a period of disability caused by a disease or injury. AR 548. Pursuant to the Policy, the test of disability is as follows:
From the date that you first become disabled; and until Monthly Benefits are payable for 24 months; you will be deemed to be disabled on any day if; solely because of: disease or injury ; either of the following applies to you:
• you are not able to perform the material duties of your own occupation ; or
• your earnings from working in your own occupation are 80% or less of: your adjusted predisability earnings .
* * *
During the own occupation period; there is no limit on earnings from working in another occupation. If you work in another occupation while disabled from your own occupation ; your monthly benefit may be adjusted as described on the Summary of Coverage; Benefit Adjustment While Disabled and Working.
Any Reasonable Occupation Period
After the first 24 months that any Monthly Benefit is payable during a period of disability; you will be deemed to be disabled on any day if; solely because of: disease or injury ; either of the following applies to you:
• you are not able to work at any reasonable occupation ; or
• your earnings from working in any occupation are 50% or less of: your adjusted predisability earnings .
Id. (emphasis in original).
The Policy defines reasonable occupation as "any gainful activity for which you are; or may reasonably become; fitted by: education; training; or experience." AR566 (emphasis in original). A period of disability ends on the first to occur of certain circumstances, including but not limited to:
• The date Aetna finds you are no longer disabled or the date you fail to furnish proof that you are disabled.
• The date Aetna finds that you have withheld information which indicates you are performing, or are capable of performing, the duties of a reasonable occupation (if you are receiving benefits for being unable to work any reasonable occupation).
* * *
• The date you fail to give proof that you are unable to perform the duties of any reasonable occupation for compensation or profit equal to more than 50% of your adjusted predisability earnings (if you are receiving benefits for being unable to work any reasonable occupation). (This does not apply to all other Non-contract, Stock Clerks, Flight Simulator Technicians, Flight Training Instructors and Dispatchers.)
AR549-50 (emphasis in original).
The Policy also reduces the amount paid by Aetna if claimants receive other income benefits through Workers' Compensation or the Social Security Act. Specifically, the Policy states that any monthly benefit actually payable will be reduced by "other income benefits," which includes "any amount you receive; or are eligible to receive: under Worker's Compensation," and "any amount you, your spouse or your children (under age 18) receive; or are eligible to receive; because of your disability or retirement under the Federal Social Security Act ... or similar plan, law, or act." AR551.
B. Ferrin's Injury and Treatment
On January 4, 2008, Ferrin suffered a lower back injury while lifting a heavy bag at work. AR31, 684. Due to back pain from that injury, Ferrin eventually stopped *914 working on or around July 20, 2011. AR23, 27, 31, 99, 270, 684. As of her last day of work, Ferrin's job title was Customer Service Supervisor, which required lifting and moving items weighing up to 70 pounds on a regular basis, and repetitively lifting and/or moving items weighing 40-50 pounds on raised surfaces. This was considered a medium physical demand level occupation. AR23, 35, 132, 791-792. Ferrin's basic monthly pre-disability earnings, as defined by the Policy and calculated by Aetna, were $5,219.07. AR283.
Despite other conservative treatments, Ferrin's back pain eventually required surgical intervention. On August 10, 2011, Ferrin underwent lumbar decompression and instrumented fusion at L4-L5 for spondylolisthesis. AR31, 99, 902, 905. Following surgery, Ferrin took pain medications and attended physical therapy. AR872, 902.
On December 14, 2011, Ferrin submitted a claim for LTD benefits to Aetna. On December 15, 2011, Ferrin's treating neurosurgeon, Dr. Martin Luken, submitted a physician statement to Aetna that stated Ferrin was capable of sedentary work activity and was undergoing physical therapy following her back surgery. AR905-06. Dr. Luken saw Ferrin for 14 regular monthly follow-up appointments between November 2011 and January 18, 2013. AR815-21, 827-30, 854-58, 870-73, 902-03.
On February 8, 2012, Aetna performed a review and found Ferrin could not perform the lifting, carrying, pushing, and pulling requirements of her medium level job. AR21-30. As a result, Aetna determined that Ferrin was totally disabled from her own occupation, and on February 16, 2012, approved Ferrin's LTD claim, effective October 19, 2011. AR282-83. On February 24, 2012, Aetna informed Ferrin that she may be eligible for Social Security Disability Insurance ("SSDI") benefits and offered to submit an application on Ferrin's behalf. AR880. Aetna retained Allsup, Inc., a Social Security claims advocator company, to represent Ferrin at the claim level at no cost to her. Id. A few months later, on August 31, 2012, Ferrin was approved for SSDI benefits effective January 2012. AR848-51. The Social Security benefits decreased Aetna's monthly benefit payments by $1,639.00, which when taking Workers' Compensation payments Ferrin was receiving into consideration, reduced the monthly amount Aetna owed her to $100. AR298.
Also in February 2012, Dr. Luken noted that Ferrin had developed degenerative changes in both hip joints, with an almost complete obliteration of her left hip joint, resulting in disabling pain in her left hip. AR870. Dr. Luken opined Ferrin's hip injury was critically exacerbated by her lower back injury, and he suggested Ferrin consider orthopedic consultation for repair. AR871. Ferrin consulted with Dr. David Smith, who recommended Ferrin undergo left hip arthroplasty. AR830. Dr. Luken agreed with Dr. Smith's plan of action and certified that Ferrin remain off work to plan for the surgery and continue her physical therapy program. Id. Ferrin underwent a left total hip replacementarthroplasty procedure with Dr. Smith on June 4, 2013. AR795-96.
On March 19, 2013, Aetna notified Ferrin that, beginning in October 18, 2013, the policy's definition of disability changed from an "own occupation" standard to an "any reasonable occupation" standard as defined by the Policy. AR306-07.
By September 2013, Ferrin's hip pain had improved, but she continued to experience back pain. AR783. On September 26, 2013, Dr. Smith submitted to Aetna an attending physician statement that indicated "no ability to work." He also submitted a capabilities and limitations worksheet that explained Ferrin could sit "occasionally"
*915 (less than 2.5 hours per day)[2] and could not stand or walk. AR788-89. Dr. Smith confirmed that Ferrin could not do full-time sedentary work on October 11, 2013. AR756.
On October 18, 2013, Aetna determined that Ferrin met the test of disability under the "any reasonable occupation" standard. Aetna also informed her that it would periodically request updated medical information to verify continued eligibility for LTD benefits. AR338-39.
On April 29, 2014, Dr. Smith submitted an attending physician statement to Aetna again indicating "no ability to work." AR728. Dr. Smith also completed Aetna's capabilities and limitations worksheet, in which he stated Ferrin could only sit, stand, and walk on an occasional basis (1-33% of a day, up to 2.5 hours per day). In response to how many hours per day Ferrin should be working, Dr. Smith wrote "0." AR729.
On May 12, 2014, Dr. Luken noted that Ferrin was "nearing the completion of her physical therapy efforts related to her hip replacement, and she [had] been very gratified by the relief her hip surgery provided her: She is now able to walk about in reasonable comfort." AR718. However, Ferrin still reported mechanical back pain "with any prolonged walking or other exertions." Id. Dr. Luken discussed with Ferrin "resumption of some sort of gainful employment, and [he] expressed [his] skepticism that she will ever be able to resume the sort of work which [he] understood she routinely performed as an airport ticket agent, with repetitive bending and lifting of pieces of luggage of variable and unpredictable weights."Id. He recommended a Functional or Work Capacity Evaluation ("FCE") to "define more precisely appropriate activity limits for Ms. Ferrin to observe when she returns to work." Id.
On May 22, 2014, Ferrin's Workers' Compensation benefits expired, increasing Aetna's payments to Ferrin from $100 to $1,492.44. AR449-51; R. 91 ¶ 16. On June 7, 2014, occupational therapist Frank Berardi conducted an FCE. AR386-408. Mr. Berardi concluded that Ferrin demonstrated the ability to perform a "light" occupation as defined by the U.S. Department of Labor's Dictionary of Occupational Titles. He noted that Ferrin could not sit for more than one hour and 24 minutes at a time. AR388. Ferrin could stand nearly as long, for a total of 1 hour, 45 minutes, with the longest continuous period of standing 1 hour, 22 minutes. AR401. Mr. Berardi indicated these periods translated to "frequent" sitting and standing mobility.
On June 9, 2014, Dr. Luken submitted an attending physician statement and capabilities and limitations worksheet. AR721-22. In that worksheet, he explained Ferrin was unable to lift, push, pull, or drive due to disabling back pain. He estimated her "return to work" date as "to be determined." Id. Dr. Luken also referred Aetna to the FCE results, though it does not appear he had received them, noting "waiting for FCE, WCE" in the treatment summary category. AR721, 724. Two days later, on June 11, 2014, Ferrin also saw Dr. Smith. Dr. Smith noted Ferrin was currently off of work, taking Vicodin, ambulating with no support, and working on endurance and strength. He "advised her to continue along those efforts." AR674.
*916 Ferrin had her last follow-up visit with Dr. Luken on September 22, 2014. AR643. Dr. Luken noted that her symptoms and clinical findings were largely the same as her last visit on May 12, 2014. She continued to take hydrocodone, Ambien, and Xanax for her low back and leg pain. Id. Dr. Luken explained that the basis for her continuing pain could be attributed to "adjacent segment disease" (also known as transitional syndrome), where the vertebrae above the fusion site develops degenerative symptoms as a result of increased mechanical stress. Id. Dr. Luken suggested that an extension of her lumbar fusion would provide a significant degree of relief, and referred her to another physician for re-evaluation. Id.
C. Aetna's Denial of Benefits
On July 1, 2014, Aetna referred Ferrin's file to in-house clinical reviewer Kimberly Pease, RN. Pease noted that the FCE results indicated Ferrin was capable of performing light work with restrictions to limit stress on the low back. AR194. Nurse Pease explained that Ferrin needed frequent position changes to avoid constant sitting/walking, or standing over an eight-hour work day. Pease stated that the new information received "did not change prior clinical conclusions" and that there was "no supporting objective documentation to support functional impairment." Id.
On July 1, 2014 Aetna wrote to Ferrin that based on Ferrin's FCE results and review with Aetna's clinical consultant, she was capable of performing a light occupation. AR383. Aetna also informed Ferrin that if she could provide documentation to show that the results were incorrect, the determination that she could perform light work would be reviewed. AR468. Aetna asked Dr. Smith to state whether he agreed with the FCE finding that Ferrin was capable of light physical demand work. AR385. Dr. Smith did not respond to Aetna's letter. AR519.
On July 2, 2014, Aetna referred Ferrin's case to vocational rehabilitation consultant Diane Winiarski to perform a transferrable skills analysis ("TSA"). The TSA found Ferrin had transferrable skills of administering, information giving, accommodating, and verbal and numerical record keeping. AR198-202. Based on the skills and the restrictions outlined in the FCE, Ms. Winiarski identified the following sedentary occupations that Ferrin could perform, all of which had hourly mean rates of more than Ferrin's required $15.54/hour: 1) reservations agent; 2) taxi cab coordinator; 3) motor vehicle dispatcher; 4) motor vehicle assignment clerk; 5) surveillance system monitor; and 6) taxicab starter. Id. ; AR667-68.
On July 31, 2014, Aetna notified Ferrin that her LTD benefits were being terminated effective August 1, 2014 because she no longer met the Policy's definition of disability. AR409-12. In the letter, the claim reviewer represented that the FCE "indicates that you are capable of performing a light occupation with restrictions to limit stress on your low back." AR410. The letter listed the restrictions on lifting, carrying, pushing, and pulling to 20 pounds, consistent with the FCE, but failed to communicate the FCE's findings of ability to sit/stand/walk only at the frequent level. AR410. Aetna determined that appropriate positions existed within Ferrin's labor market and physical capacity, and that the salaries for the identified positions were equal to or greater than 50% of her adjusted predisability earnings. AR410. The letter addressed and distinguished Ferrin's SSDI award, explaining that little weight was given to her SSDI determination because Aetna had obtained significant additional information since her SSDI benefits had been awarded. AR409-12. In particular, Aetna stated:
[W]e have updated your LTD claim record, as explained earlier. We received *917 additional medical records from your providers. We have had these and other medical records reviewed by qualified medical consultants who have contacted your treating physician(s) to discuss your case. We have also reviewed and considered the information provided relating to your approval for SSD benefits.
AR411.
Ferrin appealed Aetna's denial on September 23, 2014. AR653-54. That same day, Dr. Smith provided an attending physician statement, which opined Ferrin could not perform prolonged standing or walking or lift or carry objects over 5-10 pounds. AR661-62. In the statement, Dr. Smith noted that Ferrin could not work any hours in a day and reported that Ferrin would need to be off work with an "undetermined" return to work date. Id. According to Dr. Smith, Ferrin still took pain medication regularly, still needed physical therapy, and would need surgery in the future. Id. Dr. Smith also filled out a capabilities and limitations worksheet. AR664. He restricted Ferrin to sitting, standing, and walking only on an "occasional" basis, up to 1/3 of the day, or up to 2.5 hours. Id. He also restricted her lifting/carrying and push/pull to only 5-10 pounds. Id. Lastly, Dr. Smith reported Ferrin was never to climb, crawl, kneel, bend, twist, or stoop. Id. Dr. Smith stated these restrictions could last six months or longer, depending on whether Ferrin needed to undergo additional surgery. Id.
On November 7, 2014, Ferrin presented to another orthopedic surgeon, Dr. Daniel Troy for a second opinion. AR629-30. Dr. Troy noted that she was ambulating independently without an assistive device, but had pain going to both the right and left sides, as well as on the site of her surgical incision. He also noted no pain with range of motion of her left hip and that her surgery was "done very successfully." AR629. Dr. Troy also explained that Ferrin had "transitional syndrome developing at the L3-4 level" and "moderately advanced arthritic changes of the right hip approaching endstage." AR630. Dr. Troy wrote in a letter "to whom it may concern," that Ferrin had a failed lumbar spine fusion surgery at the L4-5 levels in 2011 and transitions syndrome at the L3-4 levels. He explained that she had no ability to perform "sedentary or un-sedentary" work. AR631. He submitted a capabilities and limitations worksheet dated November 21, 2014, stating that Ferrin could sit, stand and walk occasionally, up to 2.5 hours. AR638-40. In a January 26, 2015 letter, Dr. Troy stated:
After closely reviewing Ms. Ferrin's past medical history including surgical interventions, conservative treatments such as physical therapy and medications, as well as based on my own physical examination and review of plain X-rays, it is of my professional medical opinion that Ms. Ferrin is unable to proceed forward with her job and requires permanent disability.
AR621.
On February 4, 2015, Aetna hired Dr. Timothy Craven to review medical records and render an opinion on Ferrin's functional status. AR615-19. Aetna sent Dr. Craven 172 pages of records for review with its referral form. AR908-1081. Dr. Craven did not examine Ferrin. In his report, Dr. Craven acknowledged Ferrin's functional impairment due to chronic low back pain and right hip arthritis. AR618. He explained that the FCE was an objective test of her physical capacity for work. Dr. Craven opined that Ferrin could perform work of a sedentary physical level, but he noted that Ferrin could not work at a light physical level because of her restrictions on standing and walking. AR616. Dr. Craven called Drs. Smith and Troy to *918 discuss Ferrin, but neither called him back. AR618.
On March 4, 2015, Aetna upheld its decision to deny Ferrin's LTD benefits, effective August 1, 2014. AR442-45. Aetna stated that the FCE supported Ferrin's ability to perform sedentary work and that its prior vocational review identified sedentary jobs that Ferrin could perform in her geographical area. Id. Aetna also explained that following her lumbar and left hip surgeries, Ferrin's examination findings revealed no neurological or musculoskeletal impairment. Id.
Legal Standard
ERISA provides claimants with a federal cause of action to recover benefits due under an ERISA plan. 29 U.S.C. § 1132(a)(1)(B). The Supreme Court has established that "[d]ecisions of [ERISA] plan administrators presumptively receive de novo review, but if the plan establishes discretionary authority then review will be deferential." Perlman v. Swiss Bank Corp. Comprehensive Disability Protection Plan , 195 F.3d 975, 980 (7th Cir. 1999) (citing Firestone Tire & Rubber Co. v. Bruch , 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989) ). The Policy at issue awards discretionary authority to Aetna to determine whether beneficiaries are entitled to benefits for ERISA matters. See R. 59-2 at 29. The parties briefed whether a de novo standard applied or a standard that is deferential to Aetna. See R. 59, 67, 72, 77. The Court finds that a de novo standard applies because Texas law[3] voids the discretionary clause in the Policy.[4]
Texas bans discretionary clauses from any "forms." Tex. Admin. Code § 3.1203. A "form" includes any (a) policy, (b) contract, (c) certificate, (d) application attached or required to be attached to a policy, contract or certificate, or (e) rider or endorsement attached to or used in connection with the policy, contract, or certificate. Tex. Ins. Code § 1701.002. The Texas ban on discretionary clauses sets forth the specific circumstances in which it applies as follows:
(b) Except as specified in subsections (c) and (d) of this section, this subchapter applies to forms offered, issued, renewed, or delivered on or after June 1, 2011, including forms that include premium waiver provisions based upon a disability determination.
(c) For forms that include disability income protection coverage providing for periodic payments during disability due to sickness and/or accident, whether provided through a policy, certificate, or rider, this subchapter applies to forms offered, issued, renewed, or delivered on or after February 1, 2011.
(d) For forms issued or delivered prior to the effective date of this subchapter that do not contain a renewal date, this subchapter applies on or after the effective date of any rate increase applicable to the form or any change, modification, or amendment of the form occurring on or after June 1, 2011.
28 Tex. Adm. Code § 3.1201. The parties dispute whether the documents to which Ferrin points fit into the applicable categories defined by the Code.
The Court finds several documents provided by Ferrin indicate this Policy falls into the Texas Code barring discretionary clauses. First, Aetna issued a certificate of coverage on February 9, 2011. R. 59-4. Aetna signed the certificate on the same day it issued it: February 9, 2011. Id. The *919 certificate states it replaces page 9010 of the Policy, which identifies the applicable certificates of coverage. Id. Presumably, the certificate was not delivered before it was issued. The Court finds this alone constitutes a form that was "offered, issued, renewed, or delivered" on or after February 1, 2011, meeting the requirement of subsection (c).
Aetna argues that subsection (c) was intended to apply only to new policies and renewals, and that subsection (d) was intended to apply to amendments and changes. Aetna argues that the certificate of coverage was merely an immaterial amendment to the policy, and as a result, subsection (c) does not apply. The plain language of the Code does not support that interpretation. Subsection (c) clearly states it will apply to forms "offered, issued, renewed, or delivered on or after February 1, 2011." A "form" includes a "(e) rider or endorsement attached to or used in connection with the policy, contract, or certificate." Tex. Ins. Code § 1701.002. The certificate of coverage is plainly titled "Rider 6" and is made part of the Policy. R. 59-4. There is nothing in the language of subsection (c) that suggests it applies only to new policies and renewals rather than amendments to the policy. The Court also rejects Aetna's perfunctory argument that because the certificate did not make any material changes to the policy, subsection (c) does not apply. R. 67 at 4. The Code does not distinguish between forms that are material versus those that are not. It simply states that any form delivered or issued after February 1, 2011 would cause the discretionary clause ban to apply.
The Court also finds persuasive the significant evidence Ferrin presents that indicates the Policy was renewed after February 1, 2011. See R. 59 at 8-12 (citing several documents indicating Aetna and Southwest's broker discussed at length a renewal of the policy); see also R. 59-9 (explaining that Aetna and Southwest acknowledged the transaction at issue was a "renewal" 88 unique times). Aetna's argument that despite that clear language, the discussion was not a renewal, is unavailing.
The Court also finds that applying the ban to the above documents comports with the intent underlying the Texas ban to eliminate discretionary clauses and entitle insureds to de novo review by courts. The commissioner of insurance indicated it adopted these new codes to prohibit the use of discretionary clauses to protect consumers from "the possibility of incorrect and unfair coverage determinations by insurers and HMOs (carriers) without a subsequent opportunity for a full and independent review under a non-deferential standard." Final Adoption of 28 Tex. Adm. Code § 3.1201, 35 TEXREG 11259 (Dec. 17, 2010).[5] The commissioner explained that:
A de novo standard of review allows for a full independent examination of claim determinations without affording deference to a carrier's determination.... Discretionary clauses are unjust, encourage misrepresentation, and are deceptive because they mislead consumers regarding the terms of the coverage. For example, a consumer could reasonably believe that if they are disabled, they will be entitled to benefits under the policy and will be able to receive a full hearing to enforce such rights in court. Instead, a discretionary clause permits a carrier to deny disability income benefits even if the insured or enrollee is disabled, provided that the process leading to the denial was not arbitrary or capricious.
*920 Id. Because the Policy's discretionary clause is not valid under Texas law, the standard of review reverts to the default for ERISA cases-de novo review.
In applying "de novo review," the Court makes an independent determination of whether Ferrin is entitled to LTD benefits under the Policy. See Krolnik v. Prudential Ins. Co. of Am. , 570 F.3d 841, 843 (7th Cir. 2009) ; Diaz v. Prudential Ins. Co. of Am. , 499 F.3d 640, 643 (7th Cir. 2007) (the "ultimate question" is whether the plaintiff "was entitled to the benefits he sought under the plan"). "The court must determine-based on all evidence in the record-whether [the plaintiff] qualifies for long term disability benefits under the terms of the Plan." Walsh v. Long Term Disability Coverage for all Employees Located in United States of DeVry, Inc. , 601 F.Supp.2d 1035, 1040 (N.D. Ill. 2009) (citing Diaz , 499 F.3d at 643 ). It is Ferrin's burden to prove she is entitled to benefits by a preponderance of the evidence. Curtis v. Hartford Life & Accident Ins. Co. , 64 F.Supp.3d 1198, 1212 (N.D. Ill. 2014) (citing Ruttenberg v. U.S. Life Ins. Co. , 413 F.3d 652, 663 (7th Cir. 2005) ).
Conclusions of Law
Ferrin must show by a preponderance of evidence that she is entitled to LTD benefits under the policy from August 1, 2014 to the present. Because Ferrin had already received 24 months of disability benefits, she is disabled if "solely because of disease and injury," she is unable to work in "any gainful activity for which [she is]; or may reasonably become; fitted by: education; training; or experience," and if her earnings from working in "any occupation are 50% or less of: [her] adjusted predisability earnings." AR566, 1140. Ferrin disputes Aetna's determination that she is capable of working in a "sedentary" occupation for a sufficient portion of the day to reach the required 50% or more predisability earnings.
The term "sedentary" is a term of art utilized by both the Department of Labor and the Social Security Administration. The Department of Labor Dictionary of Occupational Titles Appendix C states "[s]edentary work involves sitting most of the time, but may involve walking or standing for brief periods of time." Dictionary of Occupational Titles Appendix C, § IV.[6] The Social Security Administration has explained that in "sedentary work," sitting would generally total about six hours of an eight-hour workday. Juszynski v. Life Ins. Co. of N. Am. , 2008 WL 877977, at *7 (N.D. Ill. Mar. 28, 2008) (explaining that these definitions are instructive in ERISA cases). The Court will address first the medical reports in the administrative record and then turn to the non-treating evidence.
A. Medical Reports
The records of Drs. Luken and Smith both support that Ferrin could not engage in sedentary work. The Court places the most significance on these reports, because as treating physicians, Drs. Luken and Smith are more familiar with Ferrin's conditions and circumstances. See Israel v. Colvin , 840 F.3d 432, 437 (7th Cir. 2016) ("We give more weight to the opinions of treating physicians because they are most familiar with the claimant's conditions and circumstances."). Dr. Smith repeatedly indicated Ferrin had "no ability to work," and noted she could not sit or stand/walk for more than 2.5 hours a day. See AR661-62, 788-89. As of September 2014, Dr. Smith also noted that Ferrin regularly needed to take pain medications to treat the pain from her low back injury and that she might need surgery in the future. The records from Dr. Smith are corroborated by the years of visits to Dr. Luken, who *921 continuously noted Ferrin suffered pain, required physical therapy, and might need additional surgery to treat her disabling pain. AR643, 718.
Further, although the Court places less significance on Dr. Troy's opinion because he only saw Ferrin once, Dr. Troy's opinion further confirms Ferrin's inability to perform sedentary work. He expressly opined that she required permanent disability, and noted she could only sit, stand, or walk occasionally up to 33% of the time (or 2.5 hours). AR638-40.
The FCE likewise supports Ferrin's inability to withstand sedentary work. Although Mr. Berardi concluded Ferrin could perform "light" work, that conclusion is not supported by the FCE findings and was discounted by Aetna's medical reviewer Dr. Craven. AR618. The FCE findings explained that Ferrin could not sit for more than one hour and 24 minutes at a time before experiencing significant pain. And she could only stand for one hour and 22 minutes at a time. Mr. Berardi found these findings sufficient to meet the "frequent" ability for both sitting and standing. AR388. Mr. Berardi's finding, however, encompasses a wide range of sitting capacity. The "frequent" determination only explains that Ferrin can sit and stand for between 1/3 to 2/3 of the day, which equates to about 2.5 to 5.5 hours. Based on other medical records that indicate Ferrin can only sit between .5 and 2.5 hours a day, the Court finds her sitting capacity falls in the lower half of the range. See Sangha v. Cigna Life Ins. Co. of New York , 314 F.Supp.3d 1027, 1036 (N.D. Cal. 2018) ("frequent" range of activity (2.5-5.5 hours) encompassed a "wide range of sitting capacity that falls within this range.").
Aetna argues that simply because Ferrin cannot perform sedentary work for six to eight hours a day does not mean that she cannot perform "any gainful activity" on a part-time basis. R. 91 at 12. The Court does not find that argument persuasive given the remaining medical records and evidence, which indicate Ferrin can sit or stand only for several hours at a time. Based on these records and evidence, the Court finds it more likely than not that Ferrin could not earn more than 50% of her predisability earnings to meet the criteria for a finding of no disability.[7]
The Court gives less weight to the independent medical evaluation by Dr. Craven because he did not examine Ferrin himself. Dr. Craven's opinion that Ferrin had the ability to stand/walk "frequently" was based on the FCE, and for the same reasons described above, does not tip the scales toward a finding that Ferrin was capable of performing sedentary work. The Court also refuses to discredit Dr. Smith and Dr. Troy's findings simply because they failed to return Dr. Craven's calls to discuss their opinion, as Aetna requests. There are many reasons doctors may not return an independent medical examiner's calls. See *922 Tassone , 264 F.Supp.3d at 875 (explaining there is no upside to a treating physician to engage in a war of opinions with an insurer's doctor); Brenner v. Hartford Life & Accident Ins. Co. , 2001 WL 224826, at *5 n.10 (D. Md. Feb. 23, 2001) (stating physicians often do not respond to such requests due to other pressing demands in doctors' schedules).
Finally, Ferrin's long history of treatment indicates Ferrin's complaints of pain are credible. Ferrin had two surgeries-for her back and her left hip-and more than one doctor recommended that she have another surgery for her back pain and deteriorating right hip. She also attempted to alleviate her pain with physical therapy and pain medication. Doctors consistently noted Ferrin's desire to work (see AR722), and she even underwent an FCE referred by her doctor-not Aetna-so she could explore whether she could work. The Court finds the consistency of these reports credible, and finds that they support a determination of disability under the Policy. See, e.g., Diaz v. Prudential Ins. Co. of Am. , 499 F.3d 640, 646 (7th Cir. 2007) (explaining that plaintiff's long history of medical treatment, including surgery and medications, in search of pain relief lend credibility to plaintiff's disabling symptoms); Carradine v. Barnhart , 360 F.3d 751, 755 (7th Cir. 2004) (explaining the improbability that a claimant would undergo multiple surgeries, take narcotics, and trick doctors into performing medical procedures and prescribing drugs just to strengthen the claimant's disability claim).
The Court finds that Ferrin's medical records support that she was unable to perform a sedentary level of work, and as a result that she could not perform any reasonable occupation as defined by the Policy.
B. Other Evidence
Ferrin also points to her award of SSDI benefits as evidence of her disability. AR848. Though not binding, the Court can consider SSDI benefits for their persuasive value, and courts in this district routinely hold such findings to be compelling evidence of a claimant's disability. See Juszynski , 2008 WL 877977 at *12 (listing cases). The administrative record did not contain the administrative law judge's findings, but the Court finds that the award itself further supports the Court's disability finding.
The Court also finds the SSDI decision compelling because Aetna itself hired Allsup, a third-party social security claims advocator company, to help Ferrin recover benefits. Any benefit Ferrin received from the Social Security Act directly reduced Aetna's liability to Ferrin, per the Policy terms. Accordingly, Aetna's later denial of Ferrin's disability, despite the SSDI decision and Aetna's attempt to diminish its force, warrants some skepticism. See Ladd v. ITT Corp. , 148 F.3d 753, 756 (7th Cir. 1998) (explaining that where insurer encourages claimant to apply for SSDI, provides her with legal representation, and financially benefits from the SSDI award, its subsequent denial of the claimant's disability deserves skepticism).
The Court is likewise skeptical of Aetna's sudden denial of Ferrin's benefits, despite no significant improvement in her condition. After the 24-month initial period, on October 18, 2013, Aetna approved Ferrin for LTD benefits based on the same "any reasonable occupation" standard applicable now. Aetna then denied Ferrin benefits on August 1, 2014. At that point, although Ferrin's condition had improved somewhat from her condition immediately following her surgeries, Ferrin still reported pain, was taking pain medications, and her doctors had recommended additional surgery. In fact, in September 2014, Dr. Luken reported that Ferrin's symptoms were largely unchanged from *923 May 2014, just before Aetna's denial. AR634. Ferrin contends that Aetna's sudden denial was related to her loss of Workers' Compensation benefits in May 2014, increasing Aetna's monthly payments to Ferrin by $1,392.44. AR449-51; R. 91 ¶ 16. The Court need not delve into Aetna's intent.[8] But it finds that Aetna's initial approval of benefits and then later denial without any significant change in her condition provides additional supporting evidence of her disability. See Juszynski , 2008 WL 877977, at *5-6 (explaining that "the fact that LINA had already approved LTD benefits may weigh in favor of Juszynski if LINA has failed to produce evidence that either the claimant's medical condition improved or the information available to the insurer otherwise changed in some significant way").
* * *
Ferrin's medical records and her long history of attempted pain management indicate she cannot perform work at a sedentary level. The Court finds these records, along with the Social Security disability findings and Aetna's previous LTD finding, to warrant a finding that Ferrin continues to be entitled to disability benefits under the Policy. Consequently, the Court awards Ferrin LTD benefits from August 1, 2014 to the date when the claim record was closed.
Ferrin also requests an award of prejudgment interest. ERISA does not expressly provide for such an award. The Seventh Circuit has held, however, that such an award is presumptively appropriate. Fritcher v. Health Care Service Corp. , 301 F.3d 811, 819-20 (7th Cir. 2002). As such, the Court awards Ferrin prejudgment interest at the prime rate. See Gorenstein Enterprises, Inc. v. Quality Care-USA, Inc. , 874 F.2d 431, 436 (7th Cir. 1989). However, the Court does not rule Ferrin will always be entitled to disability benefits under the Policy, as Ferrin requests. Such a request must be made through Aetna based on more current medical records and other evidence. Rather, the Court rules that based on the evidence in the administrative record, Ferrin meets the disability definition in the Policy.
CONCLUSION
For these reasons, the Court grants Plaintiff Kathy Ferrin's Motion for Judgment, R. 85, and denies Defendant Aetna's Motion for Judgment, R. 88. The parties should submit an agreed proposed judgment order calculating the sum of the benefits to which Ferrin is entitled plus prejudgment interest at the prime rate on or before October 15, 2018. If the parties disagree as to the calculation, they should explain the basis of their disagreements in a short joint statement filed on or before October 15, 2018.

Any citations to the Administrative Record ("AR") will refer to the Bates numbered page of the record, omitting "Admin."

Throughout this opinion, when the Court refers to an "occasional" ability to sit or stand/walk, it means an ability to do so for up to 1/3 of the day, or between .5 and 2.5 hours. A "frequent" ability to sit or stand/walk, means an ability to do so for between 1/3 and 2/3 of the day, or 2.5 and 5.5 hours. See AR618; Sangha v. Cigna Life Ins. Co. of New York , 314 F.Supp.3d 1027, 1035 (N.D. Cal. 2018).

The Policy was delivered in Texas. R. 59-2. The parties do not dispute that Texas law governs, and focus their analysis on Texas law. See R. 67 at 1.

The Court informed the parties on July 5, 2017 that it would apply the de novo standard of review. R. 79.

Available at http://www.tdi.texas.gov/rules/2010/documents/3.1201-3.1203.pdf at 1-5.

Available at https://occupationalinfo.org/appendxc_1.html.

Notably, the cases Aetna points to in support of its argument do not contain an earnings requirement like the Policy at issue. See e.g. , Arnold v. Life Ins. Co. of North Am. , 650 F.Supp.2d 500, 502 (W.D. Va. 2009) (considering "disabled" defined as "because of [s]ickness or [i]njury, he or she is unable to perform all the material duties of any occupation for which he or she may reasonably become qualified based on education, training or experience" with no requirement on what the substitute work must pay); Mullaly v. First Reliance Standard Life Ins. Co. , 253 F.Supp.2d 279, 283-84 (D. Conn. 2003) (holding claimant not "totally disabled" under definition that required a claimant to be unable to "perform the material duties of any occupation," was silent regarding part-time capacity, and had no earnings requirement for substitute work); Kelly v. Prudential Ins. Co. of Am. , 2006 WL 2037454, at *11-12 (D. Or. July 18, 2006) (explaining there was no earnings requirement in the policy).

Aetna argues that Ferrin was denied Workers' Compensation benefits because her condition improved, indicating that is why it also found her no longer disabled. Aetna's report is not supported by the record. The references to the Workers' Compensation claim indicate that the provider disputed whether Ferrin's hip pain was related to the original 2008 work injury. See AR80 (record from December 2012 indicated Workers' Compensation provider disputed that Ferrin's hip issues are related to her back injury); AR712 (terminating her benefits because the provider found her ongoing medical treatment was not related to her work injury). Even if Ferrin's hip pain is not related to the 2008 work injury, the Policy here awards benefits for "disease or injury" with no apparent limitation that the disease or injury be work-related. Accordingly, the denial of Workers' Compensation benefits has no effect on whether Ferrin is disabled under the Policy.